Cornelius Vanderbilt, Jr. v. Commissioner.
Vanderbilt v. Commissioner
Docket No. 59266.
United States Tax Court
T.C. Memo 1957-235; 1957 Tax Ct. Memo LEXIS 13; 16 T.C.M. (CCH) 1081; T.C.M. (RIA) 57235; December 23, 1957
John W. Scott, Jr., Esq., and Herrick K. Lidstone, Esq., 15 Broad Street, New York, N. Y., for the petitioner. James J. Quinn, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in petitioner's income tax for the year 1951 in the amount of $19,319.20. There are 5 issues for decision: (1) whether petitioner's activities as an author and lecturer constituted the carrying on of a trade or business during the year 1951; (2) whether the Commissioner has the burden of proving that petitioner was not engaged in a trade or business during the year 1951; (3) whether, if petitioner was engaged in a trade or business during the year 1951, the travel and *14 hotel expenses of petitioner's then wife, on a trip to Europe in 1951, are deductible by him as ordinary and necessary business expenses; (4) whether legal expenses paid by petitioner in 1951 are properly deductible by him either as an ordinary and necessary business expense or as a non-business expense under section 23(a)(2), I.R.C. 1939; and (5) whether an amount paid by petitioner in 1951 in satisfaction of a libel judgment rendered against him in 1924 is deductible by petitioner in 1951. The parties have stipulated the amounts with respect to the above mentioned issues. In such stipulation certain concessions were made by both parties. Petitioner filed a joint return for 1951 with his then wife Patricia. Patricia did not join in the petition to this Court. Findings of Fact Petitioner is the son of the late Cornelius Vanderbilt and Grace Graham Wilson Vanderbilt. Petitioner and his then wife Patricia W. Vanderbilt filed a joint income tax return for the year 1951 on the cash basis with the collector of internal revenue for the second district of New York. Commencing in 1919 and continuing until early 1920 petitioner worked as a salaried reporter for *15 the old New York Herald and the old New York Telegram. He then worked in various capacities as a reporter and legislative correspondent for the New York Times until 1922. During that time petitioner also wrote feature matter for the United Press; he wrote magazine articles; and he wrote or was in the process of writing four books as follows: The Far West, published in 1921; Personal Experiences of a Cub Reporter, published in 1922; Personal Experiences of a Legislative Correspondent, published in 1923; and Personal Experiences of a Washington Correspondent, published in 1924. In 1922 petitioner started work as the Washington correspondent of the Universal Service, the feature service of the International News Service. Petitioner's family disapproved of the work he was doing and consequently he was "off allowance" for a while during this early period of work as a journalist, magazine writer and author of books. Shortly thereafter petitioner left Universal Service and started his own news service syndicate known as Cee Vee News. Petitioner wrote news articles, features and interview reports for Cee Vee News, which sold them to newspapers. In the fall of 1923 petitioner established *16 the Illustrated Daily News, a daily tabloid in Los Angeles; later in 1923 he established the San Francisco Illustrated Daily Herald; and in 1924 he established a newspaper in Miami, Florida. These newspapers (hereinafter sometimes referred to as the Vanderbilt Newspapers) were owned by a corporation which had been formed by petitioner and he served each paper as publisher, editor and editorial writer. The newspapers compensated him for these services. The Vanderbilt Newspapers, in addition to their normal operations, published a series of weekly newspaper supplements and also operated Cee Vee News. The newspapers were initially successful and continued publication until 1926 or 1927 at which time they ceased publication for financial reasons. Subsequently petitioner's family discharged some of the outstanding indebtedness of the newspapers. Following the close of his newspapers petitioner returned to New York to resume work as a newspaper writer. He entered a newspaper reporter contest for European interviews which he won and for which he received a substantial cash prize. Petitioner commenced writing syndicated articles and he continued this until World War II. During that period *17 in addition to his regular newspaper and news syndicate writings he regularly sold news and feature writings to many well known magazines. Petitioner's compensation for magazine stories and articles in pre World War II years ranged from as low as $150 for some single page writings to as high as $35,000 for one long story. During the late 1920's and through the 1930's petitioner sold a number of stories previously published as magazine serials or as books to motion picture producers. The motion picture companies paid as much as $50,000 for one of the stories and in addition compensated petitioner for his services as a technical director during the filming of the movies. Between 1929 and 1940 ten of petitioner's books were published. The names of the books are as follows: Reno, Park Avenue, Palm Beach, Thirteen Men, Farewell to Fifth Avenue, Too Many Wives, Woman of Washington, Children of Divorce, Ten Men, and Christianity or Chaos. The publishers of these books included the Sully Company, McCauley and Company, Script Publishing Company, Simon & Schuster, and E. P. Dutton and Company. In 1929 petitioner commenced lecturing for compensation. This continued until World War II. He *18 gave about 60 to 100 lectures a year during that period. Some of the lectures were given gratuitously but most of them were for fees ranging from $150 to $500. Petitioner's career was interrupted by the entry of the United States into World War II. Petitioner had been a reserve officer in the Army and was recalled to active duty. In 1942 petitioner's father died and he became the beneficiary of several trusts which paid him a substantial income. About that time petitioner suffered the first of several heart attacks and after hospitalization for many months petitioner was discharged from the Army. He convalesced in his home in Nevada and thereafter he resumed journalism work for the New York Post. Petitioner worked first at the Washington office of that paper and then as a reporter covering important public events during the latter days of the war and shortly thereafter. He also resumed magazine writing. Petitioner left the New York Post in 1947. Petitioner resumed professional lecturing in 1948 and by 1951 he was on tour for 40 to 60 lectures a year for fees ranging from $300 to $1,000 per lecture. Petitioner gives illustrated lectures on travel and current foreign affairs *19 topics. During the year 1951 petitioner presented lectures on Europe and European recovery from the War. The lectures were entitled, "Europe Today," "All Roads Lead to Rome," and "Germany Bounces Back." Each of these lectures included a motion picture photographed and edited by petitioner and his wife. In May of 1951 petitioner and his wife traveled to Europe. They took 8 motion picture cameras with them. While in Europe petitioner shot considerable film footage for his illustrated lectures. Petitioner's wife, who was a competent motion picture camera operator, assisted petitioner in taking pictures. Where it seemed appropriate a single scene would be photographed by petitioner and his wife at the same time, each using one or more cameras of varying sizes or types. While in Europe petitioner gathered material for a book he later wrote, called Cornelius Vanderbilt, Junior's Personal European Travel Directory. Upon returning to the United States in August of 1951 petitioner and his wife worked together on film editing and assembly. Film footage taken by petitioner's wife appeared in the final edited and condensed films used by petitioner for his lecture appearances. Petitioner's *20 lectures during 1951 and later years, using the film taken in 1951 were presented by petitioner as a family tour of Europe. The credit line in the films for the camera work read "Photographed by Mr. and Mrs. Cornelius Vanderbilt, Jr." In the 1951 filming petitioner's wife did about 30 per cent of the photography and she appeared in about 20 per cent of the film photographed by petitioner. During the year 1951, petitioner independently and through the efforts of his attorney made attempts to merchandise his films and travel materials to lecture bureaus, television programs and advertising agencies. Petitioner resumed writing books in 1947 and has had four books published since that time. The names of the books are as follows: Vagabonding Through Europe, published in 1950, Cornelius Vanderbilt, Junior's Personal European Travel Directory, published in 1954, The Living Past of America, published in 1955, and Queen of the Golden Age, published in 1956. Petitioner used agents in merchandising his works. He also sought to develop a demand for his writing and lecturing by various means such as writing for journals without compensation, accepting invitations to be interviewed, and also *21 giving a number of free lectures each season. In 1952 he began to publish a semi-monthly news letter called "Vagabonding with Vanderbilt." The petitioner's income tax returns for the years 1949 through 1955 showed income from trusts and dividends, receipts from business, business deductions, and net profit or loss from business, as follows: Income from
Net Profit
Trusts and
Receipts from
Business
(or Loss)
Year
Dividends
Business
Deductions
from Business
1949
$39,671.93
$ 3,800.00
$26,010.63
($22,210.63)
1950
39,354.60
4,852.00
23,239.30
( 18,387.30)
1951
41,082.67
6,702.67
30,175.90
( 23,473.23)
1952
40,088.35
9,512.58
33,179.45
( 23,666.87)
1953
57,377.67
1,794.16
38,394.00
( 36,599.84)
1954
44,145.49
17,828.31
64,126.17
( 46,297.86)
1955
36,865.95
48,850.43 [1]
39,523.27
9,277.16 [2]
*22 Throughout the year 1951 petitioner retained N. Henry Josephs as his attorney. During 1951 petitioner paid Josephs a retainer in the amount of $2,404.31 and Josephs rendered various legal services to petitioner in return. The character of legal services rendered to petitioner and the amount of time devoted by Josephs to those services were as follows: Time De-
voted to
Character of Legal Services
Services
Contract matters regarding lecturing by
petitioner and advice and negotiations
for television and advertising sales of
petitioner's services and his films
80%
Creditors' claims against petitioner
10%
Preparation of an income tax return
5%
Advice as to the meaning of a will
5%
The negotiations of Josephs for sale of petitioner's services and films to television networks and advertising agencies were unsuccessful. In 1924, when petitioner was the publisher, editor, and editorial writer of the Vanderbilt Newspapers, he made a statement in the course of an interview conducted by a writer for the Ladies Home Journal to the effect that a member of the executive committee of the Vanderbilt Newspapers was evidently selling or telling secrets *23 of its publications to competitive newspapers. The statement was printed in Ladies Home Journal and was reprinted by the Vanderbilt Newspapers. Thereafter, a recently discharged executive of the Vanderbilt Newspapers sued petitioner for libel and also, in 1924, recovered a judgment for libel damages against petitioner. Petitioner made final payment of the libel judgment in 1951, in the amount of $3,243.75. On his tax return for 1951 petitioner reported income from estates and trusts and other sources in the net amount of $23,707.44. This consisted of income of $41,082.67 less deductions of $17,375.23. The deductions were for attorney fees ($2,404.31), interest ($11,727.17), and payment on a judgment ($3,243.75). In his notice of deficiency the Commissioner increased petitioner's adjusted gross income by $47,551.13. His explanation of that adjustment was as follows: "Your adjusted gross income is increased in the amount of $30,175.90 and $17,375.23, respectively, representing business expenses and other expenses against estate and trust income disallowed for the reason that you have failed to show them as being ordinary and necessary business expenses." Ultimate Conclusions
*24 Petitioner's activities as an author and lecturer during the year 1951 constituted the carrying on of a trade or business. Patricia's trip to Europe in 1951, with petitioner, was primarily a personal vacation for her. Josephs' legal services for petitioner concerning contract matters regarding lecturing by petitioner and advice and negotiations for television and advertising sales of petitioner's services and his films were proximately related to petitioner's trade or business. The libelous statement of petitioner in 1924 was made by him in the course of his then trade or business. Opinion The first issue for decision is whether petitioner's activities as an author and lecturer during the year 1951 constituted the carrying on of a trade or business. The term "business" has been defined as including "that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." Flint v. Stone Tracy Co., 220 U.S. 107 (1911); Von Baumbach v. Sargent Land Co., 242 U.S. 503 (1917). Whether an occupation is carried on as a business for profit or whether it is carried on for recreation or pleasure is largely a matter of the *25 intent of the taxpayer. Thacher v. Lowe, 288 Fed. 994 (S.D.N.Y., 1922); Edwin S. George, 22 B.T.A. 189 (1931); see also Lucia Chase Ewing, 20 T.C. 216, affd. 213 Fed. (2d) 438 (C.A. 2, 1954). And it is well established that the receipts and expenditures of an activity are of prime importance in determining whether the taxpayer's intention is to engage in a trade or business for profit. Thacher v. Lowe, supra.However an occupation will not be excluded from the classification of business merely because it actually results in a loss instead of a profit. Wilson v. Eisner, 282 Fed. 38 (C.A. 2, 1922); George D. Widener et al., 8 B.T.A. 651, affd. 33 Fed. (2d) 833 (C.A. 3, 1929); Margaret E. Amory, 22 B.T.A. 1398 (1931); Doggett v. Burnet, 65 Fed. (2d) 191 (C.A.D.C., 1933). The Commissioner contends that the record taken as a whole indicates that petitioner's prime motive in engaging in his writing and lecturing activities was not a profit motive and therefore the conclusion must be that he was not engaged in a trade or business during the year 1951. *26 To support his position the Commissioner points out that it appears from the record that petitioner was not wholly dependent upon his earnings from his writing and lecturing activities in the 1920's and 1930's as he would have the Court believe, and further, that petitioner's financial well being during 1951 as well as during the years immediately preceding and succeeding that year was not dependent upon his efforts as an author and lecturer. Also the Commissioner argues that although petitioner reported a profit from his "business" for the year 1955 in the amount of $9,277.16, this is not indicative of his intent to write and lecture for a profit because $35,874.79 of petitioner's total receipts of $48,850.43 that year were received from the Ladies Home Journal for an article about his family entitled the "Vanderbilt Feud," and it is therefore obvious that this magazine article, which was his one great literary success during the post war years, is more in the nature of a "one shot hit" than the culmination of success after many struggling years of literary effort. The Commissioner contends therefore that the success of this one magazine article was an isolated transaction which *27 has no relation to petitioner's motive or intention to make a profit. The Commissioner contends that the whole tenor of petitioner's career bears a strong resemblance to that of a romanticist and adventurer andhe submits that petitioner's activities were done for self gratification and pleasure without the prime motive for profit. In summary, the Commissioner argues that when consideration is given to (1) petitioner's large losses over a number of years with no indication from the record of a possibility of profit, (2) his background of inherited wealth as a guardian against financial disaster while engaged in his writing and lecturing activities, (3) his inattention to practical business details of his venture, i.e. petitioner did not keep track of all of his lecture and writing fees and was dependent upon agents and publishers for the complete record of his receipts each year, and (4) his general propensity towards engaging in this field of endeavor whether it resulted in profit or not, the only clear determination that can be made is that petitioner's prime motive was not a profit motive, and therefore the conclusion must be that he was not engaged in a trade or business during *28 the year 1951. It is of course possible that continued losses over a longer period of time than that involved here could swing the balance the other way. However, we have carefully considered the entire record here in the light of the many cases which are pertinent to the decision of this issue and have concluded on the evidence that petitioner's activities as an author and lecturer during the year 1951 constituted the carrying on of a trade or business. Petitioner has engaged in writing and lecturing activities for more than 30 years and has engaged in no other profession. Cf. Thacher v. Lowe, supra; Morton v. Commissioner, 174 Fed. (2d) 302 (C.A. 2, 1949). The record indicates that prior to World War II petitioner's writing and lecturing activities provided enough income to at least support petitioner and his family. See Wilson v. Eisner, supra.Petitioner's career was interrupted by the entry of the United States into World War II. Petitioner, a reserve officer in the Army was recalled to active duty immediately. In 1942 petitioner's father died and he inherited wealth. Petitioner started receiving substantial amounts of income from trusts *29 of which he was the beneficiary. Nevertheless, shortly after his medical discharge from the Army in 1942, petitioner resumed his writing activities, i.e. he covered important public events for the New York Post and also wrote magazine articles. In 1948 he resumed lecturing. The record clearly shows that petitioner has always taken his writing and lecturing activities seriously and that he has devoted his time and money to those activities with a conscientious belief that they will eventually prove profitable. It is worthy of note that petitioner's writing and lecturing activities have always been of a commercial nature, i.e. he has written for newspapers, magazines, etc. Cf. Chaloner v. Helvering, 69 Fed. (2d) 571 (C.A.D.C., 1934); Henry P. White, 23 T.C. 90 (1954). Furthermore, it would seem from the record that petitioner's chances of eventually realizing a profit from his writing and lecturing activities were good and were not remote. Cf. Louise Cheney, 22 B.T.A. 672 (1931). We hold that petitioner was engaged in a trade or business during the year 1951. *30 Wilson v. Eisner, supra; Doggett v. Burnet, supra; Cecil v. Commissioner, 100 Fed. (2d) 896 (C.A. 4, 1939); James Clark et al., Executors, 24 B.T.A. 1235 (1931); George D. Widener et al., supra; Margaret E. Amory, supra. Our holding that petitioner was engaged in a trade or business during the year 1951 was based on a consideration of the record as a whole. This renders moot the question of whether the Commissioner had the burden of proving that petitioner was not engaged in a trade or business during the year 1951. Petitioner argued on brief that the Commissioner had such burden since the theory that petitioner was not engaged in a trade or business in 1951 allegedly was inconsistent with the theory of disallowance as explained by the Commissioner in his notice of deficiency. Since we hold that petitioner was engaged in a trade or business during the year 1951, we must decide whether Patricia's travel and hotel expenses incurred on the trip to Europe that year (stipulated to be $3,000) are deductible by petitioner as ordinary and necessary business expenses. *31 It is well established that amounts expended by a taxpayer for the purpose of having his wife accompany him on a business trip where the wife's presence does not serve a bona fide business purpose represent nondeductible personal expenses. Walter Schmidt, 11 B.T.A. 1199 (1928); George W. Megeath et al., 5 B.T.A. 1274 (1927); Leland D. Webb, 1 B.T.A. 759 (1925); Rev. Rul. 55-57, 1955-1 C.B. 315. Petitioner argues that Patricia's activities and participation in his trade or business justifies inclusion of her foreign travel expenses as an expense of his trade or business. To support his argument he points to the fact that his lectures (with accompanying films) had a "family tour" theme to them and that in keeping with that orientation his wife and small daughter appeared in many of the European film scenes shown during his lectures. Furthermore he estimated that Patricia shot about 30 per cent of the film footage taken on the trip and that on returning to the United States she helped him edit and assemble the film. We think the decision of this issue turns on whether Patricia's film shooting activities in Europe served a bona fide *32 business purpose on the trip since her appearances in film footage taken by petitioner is too incidental to do so and her film editing and assembling in the United States subsequent to the trip seems to us to be irrelevant to the question of whether her travel and hotel expenses in Europe were directly related to petitioner's trade or business. No doubt Patricia's film shooting activities were helpful to petitioner, but it does not appear from the record that she was taken to Europe for that purpose or that her performance of those activities was necessary. We think the record establishes that in essence the European trip was a personal vacation for Patricia and that the record fails to establish that Patricia did anything more on the trip than that which might be expected from an interested wife. We hold that petitioner has failed to show that Patricia's presence on the European trip served a bona fide business purpose and therefore her travel and hotel expenses are not deductible as ordinary and necessary business expenses. The next issue involves the propriety of a deduction for legal expenses in the amount of $2,404.31. Petitioner paid his attorney, Josephs, that amount as a *33 retainer and he rendered various types of legal services in return. Petitioner concedes that that part of the legal fee which relates to advice as to the meaning of a will is a nondeductible expense and the Commissioner does not contest the deductibility of expenses for services rendered in preparing an income tax return. About 10 per cent of the time Josephs devoted to petitioner's affairs was spent on the above two items, approximately 5 per cent to each. Another 10 per cent of the time Josephs devoted to petitioner's affairs concerned creditors' claims against petitioner. Petitioner argues that the legal fee for such services is deductible as a business expense since the claims arose from business activities. However the only evidence to support this argument is Josephs' testimony to the effect that the claims arose from business debts. This statement of a conclusion is insufficient to prove that the legal expenses involving creditors' claims were related to petitioner's trade or business. Petitioner argues alternatively that the legal fee for such services is deductible under section 23(a)(2) as an expense for the conservation of property held for the production of income. *34 Petitioner's argument in this respect, in effect, is that if his trust estate is freed from adverse claims as a result of the efforts of his attorney then the expenses of his attorney are devoted to conserving either income or property held for the production of income. This argument is also without merit. Legal expenses are not deductible under section 23(a)(2) merely because they are paid for services which relieve a taxpayer of liability, which in effect is what petitioner argues. Petitioner must show that the legal expenses were proximately related to the conservation of property held for the production of income. It is clear that he has not done this since he has not even shown how the creditors' claims arose. For all we know they may have arisen from personal transactions. Petitioner has failed to prove that the legal expenses were devoted to conserving property held for the production of income within the meaning of the statute. The remaining 80 per cent of the time that Josephs devoted to petitioner's affairs concerned contract matters regarding lecturing by petitioner and advice and negotiations for television and advertising sales of petitioner's services and his films. *35 Since we hold that petitioner's activities as an author and lecturer constitute the carrying on of a trade or business, it follows that that part of the legal fee which relates to services concerning contract matters regarding lecturing by petitioner is clearly deductible as an ordinary and necessary business expense. The Commissioner argues that the portion of the legal fee which relates to Josephs' negotiations with television networks and advertising agencies in his attempt to "sell" petitioner as the narrator of a weekly television series, is not deductible, since the television field was new and separate from those fields in which petitioner had hitherto engaged and since the negotiations were unsuccessful and petitioner never entered this new enterprise. In support of this argument the Commissioner cites Morton Frank, 20 T.C. 511 (1953), Frank B. Polachek, 22 T.C. 858, and Allan Cunningham, 22 T.C. 906 (1954). We think the Commissioner's argument is without merit. We agree with the legal principle cited by the Commissioner, namely that legal expenses incurred in investigating and looking for a new business are not deductible as ordinary *36 and necessary business expenses, Morton Frank, supra. However in our opinion that principle is not applicable here since we think the legal fees were proximately related to petitioner's trade or business and did not relate to an attempt to open a new field of activity for petitioner. Josephs attempted to "sell" petitioner as the narrator of a travelogue series on television. Instead of presenting lectures in person on the subject of travel, with accompanying films, petitioner would narrate travel films on television. This is incident to his trade or business of being an author and lecturer and is directly related thereto. We hold that the portion of the legal fee which relates to Josephs' negotiations with television networks and advertising agencies is deductible as an ordinary and necessary business expense. The cases cited by the Commissioner are clearly distinguishable. In each of the Frank, Cunningham, and Polachek cases the expenses incurred by the taxpayers were preparatory to locating business ventures of their own. In the former two cases the taxpayers, at the time the expenses were incurred, were not engaged in a trade or business other than as employees and *37 none of the claimed expenses were incurred in connection with their employment; and in the latter case the taxpayer was not engaged in any trade or business at all at the time the expenses were incurred. It followed in each case that the expenses were not deductible as ordinary and necessary business expenses. Josephs testified that the $2,404.31 legal fee was paid to him by petitioner as a retainer. No specific amount was paid for any particular service. However Josephs was able to estimate the amount of time devoted to each service he rendered for petitioner and in determining what portion of the legal fee is deductible by petitioner, we are allocating the legal fee to the various categories of services in proportion to the amount of time devoted to each such service. Accordingly, 85 per cent of the $2,404.31 legal fee is deductible by petitioner. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). The last issue for decision involves the propriety of a deduction for that part of a 1924 libel judgment against petitioner which was paid by him in 1951. In 1924, when petitioner committed the libel, he was the publisher, editor, and editorial writer of the *38 Vanderbilt Newspapers. (No point is made by the parties with respect to the lapse between the time the judgment was entered and the time of payment and we do not know the reason for the lapse.) The libelous statement was made by petitioner while he was being interviewed on the subject of the Vanderbilt Newspapers and it concerned the Vanderbilt Newspapers and their competitive struggle. In view of this we think that the libelous statement was made by petitioner in the course of conducting his then trade or business. The Commissioner contends however that the commission of the libel was not within the ordinary and necessary conduct of petitioner's business. He argues that the issue here is parallel with those cases where the taxpayer is convicted of a crime committed during the course of conducting his trade or business and incurs expenses in the nature of fines, penalties, and costs of his unsuccessful defense and that expenses of that nature are nondeductible since they are contrary to public policy. The Commissioner cites C. W. Thomas, 16 T.C. 1417 (1951), *39 G. A. Comeaux, 10 T.C. 201, affd. 176 Fed. (2d) 394 (C.A. 10, 1949), and Anthony Cornero Stralla, 9 T.C. 801 (1947) in support of his argument and he contends that those cases are controlling here. We cannot agree with the Commissioner. A private wrongdoing in the course of conducting a business is not extraordinary within the meaning of the taxing statute allowing deductions for ordinary and necessary business expenses. Helvering v. Hampton, 79 Fed. (2d) 358, 360 (C.A. 9, 1935), affirming a Memorandum Opinion of this Court. And payment of the judgment by petitioner was necessary since the judgment was final and petitioner, being solvent, had no choice but to see that the judgment was paid or to suffer an execution to be levied against himself. In Helvering v. Hampton, supra, it was held that an amount paid by a taxpayer, engaged in buying, selling, and leasing real estate, in settlement of a judgment against him and in favor of a lessee for fraud by the taxpayer in negotiating the lease, constituted an ordinary and necessary expense of carrying on his business. *40 We think this case is indistinguishable in principle from Helvering v. Hampton, supra, and on the basis of that case we hold that the amount paid by petitioner in 1951 on the 1924 libel judgment is deductible by him as an ordinary and necessary business expense. See also Valentine E. Macy, Jr., 19 T.C. 409 (1952); John Abbott, 38 B.T.A. 1290 (1938); H. M. Howard, 22 B.T.A. 375 (1931). Cf. Commissioner v. Heininger, 320 U.S. 467 (1943); Kornhauser v. United States, 276 U.S. 145 (1928). The cases relied on by the Commissioner are clearly distinguishable. In the Thomas case the taxpayer, a gambler, claimed a deduction for attorneys' fees paid in an unsuccessful defense against a criminal charge; in the Comeaux case the taxpayer, an operator of a "horse-book", claimed a deduction for amounts paid for protection from arrests and prosecution; and in the Stralla case the taxpayers, who were gambling operators, paid legal fees in the defense of certain individuals who were being prosecuted for their participation in gambling operations and also paid other amounts to the State of California as penalties which resulted *41 from the unlawful operation of a gambling ship. In each case it was held that to allow the deductions would be contrary to public policy. That is not so here. In our case we are dealing with a private wrongdoing as opposed to a public wrongdoing. To allow a taxpayer a deduction for the amount paid on a libel judgment, where the libelous statement was made in the course of the taxpayer's business, would not frustrate public policy. Decision will be entered under Rule 50. Footnotes
1. $35,874.79 of the Receipts from Business were received from the Ladies Home Journal for a magazine article entitled the "Vanderbilt Feud." This article was written by petitioner. ↩
2. Petitioner's correct net profit from business for 1955 is $9,327.16. The difference between the profit reported and the correct net profit appears to be due to a mathematical error.↩