Matilda M. BROOKS, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16355.

United States Court of Appeals
Ninth Circuit.

Dec. 21, 1959.

Stark & Champlin, Herbert P. Moore, Jr., Oakland, Cal., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Helen A. Buckley, Lee A. Jackson, Robert N. Anderson, Kenneth E. Levin, Attys. Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

BARNES, Circuit Judge.

The Tax Court reviewed a deficiency assessed against petitioner Matilda M. Brooks and found against her. The deficiency asserted involved a deduction claimed by petitioner for expenses of travel and living while petitioner was doing research in Europe during 1952 and 1953. The Tax Court had jurisdiction under 26 U.S.C. §§ 6213, 6214, 7442. The appeal is timely, and this Court has jurisdiction to review the decision of the Tax Court under 26 U.S.C. §§ 7481-7483.

Petitioner is an accomplished research scientist. She received her Ph.D. from Radcliffe College in 1920. Since 1927 she has been a member of the faculty of the University of California. Her fields of research are biology, zoology and physiology. Most of her work has been fundamental research. She discovered the use of methylene blue as an antidote for carbon monoxide and cyanide poisoning. She has had over one hundred papers published in various scientific periodicals and co-authored one book with her husband. She has been honored by election to various learned societies, among them Phi Beta Kappa and Sigma Xi. Her field of special interest involves single cells which apparently have many varieties, each variety growing in only one locality which has necessitated much travel on her part to study each in its native habitat.

For six years after receiving her Ph.D. in 1920, she worked for the United States Public Health Service, receiving about $3,000 per year, plus travel expenses to various parts of the world. In 1927, her husband, also a scientist, came to the University of California. Petitioner came to Berkeley with her husband, but because of the University's anti-nepotism rule, accepted a nonpaying research ap-

pointment. From 1927 until 1952 she worked for the University, receiving no pay except for short periods when her husband was on leave of absence and she took over his lecturing and research programs. During the years she received many grants in aid from various sources to help defray her research expenses. These were mostly in the nature of $500 each, though one was for $6,000.

In 1952 petitioner went to Europe to do further research. Her expenses for such travel and her living while traveling were $2,988 in 1952 and $3,685.20 in 1953. These are conceded by the government to be accurate expenses. The Commissioner also agrees that the travel was necessary to the furtherance of her research projects. While the Commissioner believes these are ordinary and necessary expenses, he contended that there was not a sufficient profit motive to indicate that they had been incurred in a trade or business nor that these expenses were necessary to keep petitioner from losing the small stipend she had been receiving from the University.

In 1952 the University heard that petitioner was involved in some tax disputes with the government concerning the years 1948 and 1949. Since her husband had died in 1949 and she was supporting herself, this created a serious problem. A lump sum payment of $1,000 was made to her, calculated on an estimate of the tax deficiency involved. (The Tax Court found this payment to be a gift.) She was then given a nominal stipend of $500 per year, payable in monthly installments. Since her husband's death, petitioner's only source of income, aside from the small amount from the University, has been interest, dividends and income from real estate amounting to about $4,000 or $5,000 a year. During this period she has been forced to "dip into capital" in order to take care of her living and research expense.

Petitioner testified that she had a profit motive in making the trip to Europe for her research. She testified that she had to maintain her professional standing in order to be able to be eligible for prospective research appointments, and, more particularly, to be eligible for some of the large grant in aid awards now being given by large foundations which pay "salaries" in the neighborhood of $5,000 to $7,000 per year. She had in recent years made no efforts to obtain any such appointments. In 1927 she had turned down an offer to take a position as head of the Physiology Department at Hunter College at $9,000 per year. After her husband's death, she turned down a tentative offer of a research position at the University of Pennsylvania, inferentially a paying position.

In the same years of 1952 and 1953 petitioner further claimed small expenses for dues to professional societies and laboratory fees for broken glass. The Tax Court allowed these expenses as directly connected with her status as a salaried research associate at the University of California. But the Tax Court further found that the travel expenses were not incurred with a profit motive, nor were they required by or connected with the University of California position, and sustained the Commissioner's determination of a deficiency.

■ Petitioner argues that the correct test for determining whether the taxpayer is conducting a trade or business within the statutory definition is the intent of the taxpayer upon entering the activity. Petitioner testified that profit was her intent after the death of her husband made additional sources of income necessary. The cases indicate that presence of a net profit in the short term is not essential to the requisite intent. The racing stable cases are good examples of this. E. g., George D. Widener, 1927, 8 B.T.A. 651. The requirement seems to be that the activity engaged in at the time in question be a part of the projected profit making scheme. Petitioner's own testimony indicates that any potential profit from her research activities in Europe would be as a result of being able to acquire funds from some foundation in the future as salary. There is no prospective income from pub-

lication of the results, as apparently scientific writings of this nature are not compensated for, except in resulting prestige. Petitioner is engaged in the business of free lance scientific research and while her claimed profit motive is recently acquired upon the death of her husband, the present state of affairs indicates that there are good prospects for remuneration by means of salaries from foundations.

An examination of the cases does not indicate any clear cut rule. In James M. Osborn, 1944, 3 T.C. 603, a non-salaried college professor claimed deduction for expenses involved in preparing several scholarly books, two of which were admittedly not potentially profitable, and the third which stood only a slight chance of showing a profit. The alleged profit incentive was that his stature would be increased by these books and that this would make it possible for him to gain future employment as perhaps a university president or in some equally high academic position. Deduction was disallowed on the basis that by his writing he was not actually engaging in the potentially profitable activity, but that it merely prepared him for that activity. In Manuel Cardozo, 1951, 17 T.C. 3, a college professor spent a summer studying and doing research in Europe. It was held that since he was only impliedly required to do additional research, and the research was not the activity in which he was primarily engaged, which was teaching, that the deduction should be disallowed. It might be noted that both these cases are distinguishable from the instant case in that here the present activity *is* the potentially profitable one—it is not merely a stepping stone into another type of work.

Petitioner finds support for her position in Cornelius Vanderbilt, Jr., 1957, 16 T.C.M. (CCH) 1081. Vanderbilt was the son of Cornelius Vanderbilt and at the time in question was receiving $40,000 annually from a trust fund. He had had a long background in journalistic and lecturing endeavors, and claimed deductions for expenses of a trip to Europe where he made motion pictures to show at his lectures. His "lecturing" business showed substantial losses in every year, but the Tax Court found that he was engaged in a trade or business and that the requisite profit motive was present, since potential profit was present. The factors weighed by the court in arriving at this conclusion were:

1. The length of the period over which the losses had occurred. Apparently at some previous time he had supported his family from analogous activities, but for six or seven years had shown large losses.

2. The length of time during which he had been engaged in alleged trade or business. He had been in similar activities since he started working some thirty years previously.

3. The lecturing-writing business had once provided the support for Vanderbilt and his family.

4. The Tax Court judge found that the potential for profit was good.

A further similarity between the cases is to be found in the fact that Vanderbilt did not derive his income from one steady source, but operated in a free lance fashion.

The Commissioner urges that the expenditures by Dr. Brooks resemble a capital investment—that what she was in fact doing was equivalent to getting further education in order to increase her future profit potential rather than presently engaging in a profitable enterprise. Since leaving the Public Health Service she had gained no profit from her researches—all money she had received, until the University commenced her $500 stipend, was merely to cover her expenses.

But research, and attendant expenses, was required of petitioner in order that she might retain her position with and the stipend from the University. Her contract with the University so provided. The moment her researches stopped, her compensation stopped. It is true that in a position such as hers, the degree of control usually present in the employer-

employee situation is not present. The Tax Court found that her laboratory fees and professional societies' dues were sufficiently connected with her employment to allow deduction. The Commissioner conceded that the expenses were necessary to the continuance of her research, but it did not concede that they were necessary to the continuation of her employment. It is difficult in view of mankind's almost universal drive for monetary award alone to recognize that petitioner was *required* to spend many thousands of dollars to retain the position paying her but $500 per annum.

The Cardozo case indicates that the courts are strict in finding the necessity of expenses. But that case may be distinguished on the ground that there the main profession was teaching. Here Dr. Brooks has no teaching aspirations—the only line of endeavor which she pursues is research and writing. Admittedly the principal research on which she had spent her life had to be performed in various parts of the world. She has previously traveled to the far corners of the world to continue this same research.

Under a factual situation of this kind, we recognize there are limitations on the scope of review of this Court. In Morton v. Commissioner, 2 Cir., 1949, 174 F.2d 302, at page 303, it was said:

> "Whether the activities of a taxpayer constitute carrying on a trade or business is a question of fact the determination of which by the Tax Court, if adequately supported by the record, is ordinarily conclusive on appeal."

In view of (1) the stipulated facts in this case; (2) the admission by the government "that in order to adequately perform her research duties, it was necessary for her to travel to Europe for the greater part of 1952 and 1953"; (3) that in order to maintain her position with the University of California during the years in question she was required by her contract to engage in continuous research; (4) the profit she had derived in previous years from her research, and her undisputed testimony that she expected to derive profit in the future; (5) the fact that these expenses were incurred in her *sole* present activity, research, and not for the purpose of gaining any other or better job; (6) the many years spent by petitioner in similar research throughout the world (having been sent to Miami and Bermuda by the government to do precisely the same type of scientific research), we conclude the Tax Court erred in concluding that the petitioner was not engaged in a "trade or business." We hold all her admittedly accurate travel expenses were "ordinary and necessary travel expenses" incurred in connection with her business of research.

We are convinced the facts of this case bring it more closely in line with Cornelius Vanderbilt, Jr., 1957, 16 T.C.M. (CCH) 1081; Margaret E. Amory, 1931, 22 B.T.A. 1398; and George D. Widener, 1927, 8 B.T.A. 651, affirmed, 3 Cir., 1929, 33 F.2d 833, than the cases of Henry P. White, 1954, 23 T.C. 90, affirmed, 6 Cir., 1955, 227 F.2d 779; Morton v. Commissioner, 2 Cir., 1949, 174 F.2d 302; and Coffey v. Commissioner, 5 Cir., 1944, 141 F.2d 204.

The opinion below recognizes the good faith of petitioner, and mentions "her desire to benefit mankind," and her commendable "innate drive as a pure scientist." The Tax Court judge then rules that her testimony of prospective monetary award from her research was "hope" and not based on fact. In Doggett v. Burnet, 1933, 62 App.D.C. 103, 65 F.2d 191, at page 194, there appears the following language which we believe is applicable here:

> "The proper test is not the reasonableness of the taxpayer's belief that a profit will be realized, but whether it is entered into and carried on *in good faith* for the purpose of making a profit, or in the belief that a profit can be realized thereon, and that it is not conducted merely for pleasure, exhibition or social diversion." (Emphasis added.)

The judgment of the Tax Court is reversed.