**Evelyn and John Paul DEVEREAUX, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 13407.**

United States Court of Appeals Third Circuit.

Argued Feb. 23, 1961.

Decided June 19, 1961.

John Paul Devereaux, College, Pa., petitioner, pro se.

Charles B. E. Freeman, Washington, D. C., (Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Attys., Department of Justice, Washington, D. C., on the brief), for respondent.

Before KALODNER, STALEY and FORMAN, Circuit Judges.

KALODNER, Circuit Judge.

The petitioners, husband and wife, filed this petition to review the decision of the Tax Court,[1] which determined statutory deficiencies[2] in their income tax for the years 1955 and 1956.

The single issue involved is the correctness of the underlying determination that the petitioners were not entitled to deductions, pursuant to Section 162(a) of the Internal Revenue Code of 1954, 26 U.S. C.A. § 162(a), for amounts expended by the husband (hereinafter called the taxpayer) in connection with his studies

1. The Memorandum Opinion of the Tax Court is reported at 19 CCH Tax Ct. Mem. 453 (1960).

2. Statutory deficiencies in the amount of $275.44 for 1955 and $115.51 for 1956, were determined by the Commissioner pursuant to Section 6211(b) (1) of the

Internal Revenue Code of 1954, 26 U.S. C.A. § 6211(b) (1), without regard to any credit under Section 31, 26 U.S.C.A. § 31, for taxes withheld from wages. For the year 1956, the credit allowable to the petitioners results in an overpayment irrespective of the statutory deficiency.

leading to the Ph. D. degree. All of the facts were stipulated, and as stipulated, were found by the Tax Court. There is no dispute as to the reasonableness of the expenditures.

The taxpayer was first appointed to the faculty of Pennsylvania State University in September, 1950, on a yearly contract basis as an assistant professor. There is nothing to indicate that the taxpayer could not have thus continued indefinitely, except that after his employment, effective in 1952, the University adopted new regulations relating to tenure. As these regulations applied to him, the taxpayer could continue in his employment, with a right to one year's notice of intention to terminate, until July 1, 1955, and if he did not receive such notice he would acquire "permanent" tenure, i. e., he could not be removed except for cause. Accordingly, if the University did not intend to renew his contract, thereby disallowing such tenure, it was required to give him notice not later than July 1, 1954. However, at all times subsequent to the taxpayer's appointment, it was the policy of the University to require an assistant professor to have a terminal degree (Doctor of Philosophy, Doctor of Education, or Bachelor of Laws, in most cases) before granting "permanent" tenure in such rank. It was clearly understood by the taxpayer and his superiors that he did not have either such experience or such regional or national stature in his professional field as to justify exceptional treatment.

On March 26, 1954, the head of the taxpayer's department wrote to the Dean of the School recommending the taxpayer for permanent tenure. His letter specifically recited assurance given to him by the taxpayer that he "will start next summer to study for the Ph. D. degree", and noted that the taxpayer was working to pass a Section of the C.P.A. examination in New Jersey. The letter concluded with the expression of belief that "in the long run [taxpayer] will prove a valuable member of the staff."

In June, 1954, the taxpayer commenced study at the University of Pittsburgh toward a Ph. D. degree, and has continued such study periodically since that time. He engaged in such study originally for the purpose of influencing the University's decision with respect to tenure in his then position of Assistant Professor and in order to qualify for promotion in rank and salary increases.

The desired tenure was granted to the taxpayer by letter dated July 18, 1955, as of July 1, 1955. But the taxpayer continued his course of study because of his representations to the University, and to qualify for promotion in rank and salary increases.

It is a fair summary of the taxpayer's position that he had committed himself to study for the Ph. D. degree and actually commenced such study to induce and influence the University not to give him notice of termination in July, 1954, notwithstanding that he also expected that such degree would be pertinent to any future promotion in rank and salary increase. Moreover, thereafter he continued his course of study because he was under a moral obligation, because he envisaged that if he failed to do so without good reason, the University could make it economically undesirable for him to remain, and because he retained the feeling that it would qualify him for promotion and salary increases.

The Tax Court emphasized the taxpayer's concession that when July 1, 1954 passed without his receiving a notice of termination, he was "under the wire". The taxpayer commenced his studies shortly before that date, but, in the view of the Tax Court, his continuation of them during the years 1955 and 1956 here involved, which were subsequent to the time when his existing position had become secure, was not primarily for the purpose of maintaining his existing position. It recited the taxpayer's concession that there was no requirement, either under any written contract with the University or under its academic regulations, that he study for a doctorate degree in order to maintain his position. It concluded that the taxpayer's primary purposes in pursuing his studies were to

qualify for a new and better position and to obtain the salary increases that attached to such an improved position. As such, the expenditures did not qualify for deduction under Section 162(a), but were in the nature of capital expenditures which are personal in character and not deductible for income tax purposes. See Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212.

The Internal Revenue Code of 1954, in Section 162(a), carried forward the 1939 Code provision allowing as a deduction all ordinary and necessary expenses paid or incurred in a taxable year in carrying on any trade or business. But the Regulations issued by the Commissioner pursuant to the 1954 Code, with respect to the particular area of the law here involved, Treas. Reg. § 1.162–5, are much more liberal than those under the 1939 Code.[3] We note that Congress has impliedly approved by extending the time within which claims for refund could be filed.[4] The new Regulations permit the deduction of expenses in connection with education to either maintain or improve skills required in a taxpayer's employment, and also those required by statute or by a taxpayer's employer to retain his salary, status or employment. Expenditures to obtain a new position or substantial advancement, or to meet minimum requirements of a chosen profession, are not deductible. The Tax Court has given a liberal construction to the new rules. John S. Watson, 31 T.C. 1014 (1959); Elmer R. Johnson, T.C. Memo 1961–119 (1961). It would appear that the courts were and are inclined toward liberality: Coughlin v. Commissioner, 2 Cir., 1953, 203 F.2d 307; Hill v. Commissioner, 4 Cir., 1950, 181 F.2d 906; and see Marlor v. Commissioner, 2 Cir., 1958, 251 F.2d 615, approving the dissenting opinion of Judge Raum, 27 T.C. 624; cf. Brooks v. Commissioner, 9 Cir., 1959, 274 F.2d 96.

Plainly, the circumstances of each case are critical. On the facts of this case, we are of the opinion that the Tax Court erred.

When the taxpayer was first employed by the University in 1950, he qualified for and was accorded the status and salary of assistant professor, apparently on an annual contract basis. Although at all times subsequent it was the policy of the University to require a terminal degree for tenure, that is, assurance against discharge except for cause, the taxpayer had no reason to expect that he could not have continued indefinitely in his position. The change in regulations of the University, effective in 1952, gave real and substantial basis to his belief that his contract might not be renewed July 1, 1954. In our opinion it is abundantly plain from the stipulated facts that the taxpayer gave assurance of intent to study for his doctorate, and actually began such study prior to July 1, 1954, to induce the University to renew his contract as of July 1, 1954, and thereby to maintain the very status and salary he then had. That this might also result, in 1955, in solidifying him in the same position and salary, and even make him eligible for promotion or increase in salary, is incidental, notwithstanding that the taxpayer candidly concedes these were additional inducements on his part. Hill v. Commissioner, supra. Indeed, unless he retained his position, promotion and increase in salary could be relegated to abandoned hopes. This, we think, is recognized by the Tax Court, Elmer R. Johnson, supra, and by the Commissioner, Rev.Rul. 60–97, 1960–1 Cum.Bull. 69.[5]

---

3. Note, "Deductibility of Educational Expenses", 6 Stan.L.Rev. 547 (1954); Note, "New Treasury Regulation Defines Deductibility of Education Cost as Trade or Business Expense," 58 Col.L.Rev. 1097 (1958).

4. Section 96 of the Technical Amendments Act of 1958, Title 1 of Pub.Law 85–866, approved September 2, 1958.

5. The Commissioner asserts that Example 9 contained in this Ruling, 1960–1 Cum. Bull. 69, 77–78, is almost identical to this case, but we do not agree. Not only is there absent from the hypothetical statement of facts a change in regulations, but it affirmatively appears that the sample taxpayer had reached the end of his employment possibilities as an in-

The Commissioner notes that the tax years involved are 1955 and 1956, and asserts that prior to July 1, 1955, the expenditures were not necessary to maintain his existing status in that year, and were not necessary thereafter because tenure was granted without condition. The Commissioner relies, as the Tax Court did, on the taxpayer's concession that after July 1, 1954, he was "under the wire", and upon the taxpayer's stipulation that after July 1, 1955, he was not "legally required" to continue study to retain such status.

The taxpayer appeared below, and here, *pro se*. It is our obligation to reach the substance of his position, without penalizing him for his lack of legal form and imagination. Despite his concessions, it may be said for him that he has repeatedly asserted an obligation, albeit in terms of morality, to carry through in fact the representations, and make real the manifestation of intent, with which he deliberately induced the University to retain him. We regard the stipulation as a stipulation of law, not of fact, and one which must bear the strain of judicial scrutiny. The proposition that either after July 1, 1954, or after July 1, 1955, the taxpayer could without good reason and with impunity terminate his course of study is one we find burdensome to the conscience of a court of justice, and one which we must reject. Cf. Campbell Soup Co. v. Wentz, 3 Cir., 1948, 172 F.2d 80, 83. Elementary principles of equity would permit the University to terminate or rescind that which it gave in reliance upon the taxpayer's representations, and, the taxpayer was under a correlative duty to carry out his inducements. Indeed, had the taxpayer promptly terminated his studies without reasonable cause upon gaining the commitments of the University, his conduct would have smacked so clearly of deceit that the University would have been justified in reconsidering his desirability as a member of its faculty.

For the reasons stated, the Decision of the Tax Court will be reversed, and the cause remanded with directions to proceed in accordance with this opinion.

---

structor and undertook additional education to qualify for an advancement in position, to that of assistant professor. Also, as we have said, in the case before us, the taxpayer gave his assurances and commenced his study to induce the University to continue his contract commencing July 1, 1954.