Morris S. Schwartz and Charlotte G. Schwartz v. Commissioner.
Schwartz v. Commissioner
Docket No. 76876.
United States Tax Court
T.C. Memo 1961-144; 1961 Tax Ct. Memo LEXIS 206; 20 T.C.M. (CCH) 725; T.C.M. (RIA) 61144; May 19, 1961
*206 Morris S. Schwartz was a research sociologist. On their 1955 income tax return he and his wife claimed a deduction under section 162(a)(2), I.R.C. 1954, for amounts expended by them on a trip to Europe. They also deducted an amount for depreciation on their professional library, and an amount for the portion of their residence used as a study. Respondent disallowed these deductions. Held, Morris S. Schwartz's trade or business was that of an employee and respondent correctly disallowed the amounts expended on the European trip. Held, further, because they failed to show evidence of cost and date of acquisition of their professional library, respondent correctly disallowed the claimed depreciation. Held, further, rental value of office space in their residence determined and allowed as a deduction. George E. Lodgen, Esq., 80 Federal St., Boston, Mass., for the petitioners. Norton L. Armour, Esq. and James E. Markham, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency of $1,036.47 in petitioners' income tax for the year 1955. Petitioners, in their petition, claim an overpayment in income tax of $384.66. The questions for decision are: (1) Whether portions of expenditures claimed by petitioners to have been incurred on a four-month tour of Europe are deductible as ordinary and necessary business expenses; (2) Whether a portion of amounts expended for rent and upkeep of a house in which petitioners lived is deductible as an ordinary and necessary business expense; and (3) Whether petitioners are entitled to a deduction for depreciation on their professional library. Findings of Fact Some of the facts have been stipulated. They are found accordingly. Petitioners, Morris S. and Charlotte G. Schwartz are husband and wife. They live in Watertown, Massachusetts. They filed a timely 1955 joint income tax return with the district director of internal revenue for the district *208 of Maryland. An amended joint return for 1955 was filed on December 9, 1957 with the district director at Boston. Morris S. Schwartz is a research sociologist specializing in the area of interpersonal relations among patients and between patients and personnel in mental hospitals. He received an M.A. degree in 1946 and a Ph.D. degree in 1951. A summary of Morris S. Schwartz's employment from 1947 to present is as follows: In 1947 he was employed as a faculty member by the Washington School of Psychiatry and was paid for teaching. Also, from 1947 to 1951 he was employed in a research project conducted under a grant from the National Institute of Mental Health. The funds from this grant were paid to and administered through the Washington School of Psychiatry. In this project he worked with Alfred H. Stanton, M.D., who was the principal investigator for the project. The results of the project were published in 1954 in a book, The Mental Hospital, which was coauthored by Stanton and Morris S. Schwartz. The Mental Hospital dealt with a socio-psychiatric study of a ward in a psychiatric hospital, the Chestnut Lodge Sanitarium, in Rockville, Maryland. He received royalties of about $1,500 *209 or $2,000 from this book. From about 1948 to 1954, Morris S. Schwartz was employed at Chestnut Lodge Sanitarium in various teaching capacities for which he was paid on a weekly basis. He also acted as a recorder and observer in group psychotherapy at Chestnut Lodge for which he was paid separately through research funds of a psychiatrist at the sanitarium. In addition, in about 1950 and 1951 he also supervised the research of graduate nurses at the sanitarium. He did this once a week and was separately paid for it. Concurrent with the above he acted as a psychotherapist at the Washington Institute of Mental Hygiene. In about 1951 Morris S. Schwartz applied for and received funds from the National Institute of Mental Health to do a follow-up study on the one on which he and Stanton had collaborated. In this second study he was the principal investigator and the funds were again administered by the Washington School of Psychiatry. This project ended about 1953. During this time he was also a visiting lecturer at the Washington Psychoanalytic Institute. In 1953 he submitted a proposal to the Russell Sage Foundation for funds with which to prepare a manuscript on the application *210 of social psychology to problems of psychiatric nursing care. The said foundation appropriated $17,600 for expenditure at the discretion of its director for this project. The funds were administered by the Washington School of Psychiatry. The letter which informed Morris S. Schwartz of the appropriation provided, in part: This appropriation is not a grant in the ordinary meaning of the word, since the Foundation does not now make outright grants but considers its appropriations as payments for work done on projects and for anticipated manuscripts. Our requirement is that manuscripts prepared as a result of any project sponsored by us be submitted for possible publication by the Foundation. If such a manuscript does not seem suitable for publication by us, the Foundation will relinquish its right to it with the single reservation that if it is published elsewhere, in whole or in part, acknowledgment of the Foundation's contribution will be made in a form approved by [the director]. This project resulted in the publication in 1956 by the Russell Sage Foundation of a book, The Nurse and the Mental Patient. The coauthors of this book were Morris S. Schwartz and Emmy Lanning Shockley. *211 The manuscript of the book was not finished within the original time of the grant, and the foundation extended the time and made an additional appropriation for it. Morris S. Schwartz personally received about $11,000 or $12,000 in 1953 and 1954 from this project. Between about 1953 and 1956 he was a social science consultant at St. Elizabeth's Hospital, Washington, D.C., for which he was paid. At first he spent one-half day a week in this activity, but the amount of time was later extended to one-half day, five days a week. In 1955 Morris S. Schwartz completed work on the initial draft of the Russell Sage Foundation manuscript, but received no compensation for work done on it in that year. He lectured and taught at the William A. White Psychiatric Foundation (Washington School of Psychiatry) and received total wages of $2,410, from which $369.60 were withheld for income tax. He also worked at St. Elizabeth's Hospital one-half day per week during the first part of the year and one-half day, five days a week, during the latter part of the year. His job there consisted of meeting with the psychiatric staff to help with ward problems and he received $1,240 for it. During 1955 he also *212 worked as a psychotherapist at the Washington Institute of Mental Hygiene and received $220; he lectured or taught at the Connecticut State Hospital for a three-day period and received $300; he lectured at George Washington University and received $20; and he prepared and presented a paper at Boston Psychopathic Hospital for which he received no compensation but had the expenses of his trip paid. In April 1955 he wrote to H. Ellenberger, a doctor at The Menninger Foundation in Topeka, Kansas, in part, as follows: My plans for next fall are indefinite. As a matter of fact, I am presently looking around for a new position. If the Menninger Foundation has any positions open that might be attractive to me I would be grateful to hear about them. In the summer of 1956 Morris S. Schwartz was employed by Jack R. Ewalt, the director of the Joint Commission on Mental Illness and Health, as director of a working group for the Committee on Patterns of Patient Care on a salaried basis until 1959. From 1959 to the date of trial he was employed as a professor at Brandeis University and was paid an annual salary. Besides income from the above sources, from time to time he also received varying *213 amounts of compensation, or reimbursement for incurred expenses, from lecturing, from speaking and from presenting papers. He has written numerous articles in the field of his specialty. Charlotte G. Schwartz is a sociologist specializing in the field of mental health. She received an M.A. degree in 1947 and from about 1951 to 1957 was employed on a full-time basis as a sociologist at the National Institute of Mental Health of the United States Public Health Service. She also has written numerous articles and pamphlets, some in collaboration with her husband, but has received no direct compensation as a result of her publishing efforts. Between about November of 1954 and April of 1955 the Schwartzes, and others at their behest, wrote letters to a number of mental facilities in Europe and to persons connected with the facilities, requesting interviews and making arrangements for visits to the facilities. In April 1955 the Schwartzes flew to Europe. They spent about 116 days there and returned in August 1955. During this time they visited the following persons and places: Holland, April 20-29, 1955 1. Dr. A. Sunier, Head, Psychological Service of the City Health Department, *214 Amsterdam. 2. Dr. Kroekebakker, Director, Division of Mental Hygiene, Leydon. 3. Dr. Lunk Kamp, Utrecht Clinic of the University Hospital, Utrecht. 4. Dr. Eugenia Lekkerkerker, National Federation for Mental Health, Amsterdam. 5. Dr. Mulock-Houwer, Zanbergen, Amersfoort. Denmark, May 1-7, 1955 1. Mr. Henning Friis, Ministry of Health and Social Affairs, Copenhagen. Switzerland, June 10-18, 1955 1. Dr. Andre Repond, Director, Maison de Sante de Malevox, Monthey. 2. Dr. Ronald Hargreaves, World Health Organization, Geneva. 3. Mme. M. Sechahaye, Psychotherapist, Geneva. France, June 25-July 13, 1955 1. Dr. Paul Sivadon, Centre de traitement et de readaptation sociale, Neuillysur-Marne. 2. Dr. Daumezon, St. Anne's Hospital, Paris. 3. Dr. Henri Duchene, Medicin-chef du service de Phrophylaxie Mentale, Paris. 4. Dr. Simone Blajan-Marcus, Psychoanalyst and Group Therapist, Paris. 5. Club Elan, out-patient center in Paris. England, July 14-August 10, 1955 1. Dr. Maxwell Jones, Director, Industrial Rehabilitation Unit, Belmont Hospital, Sutton, Surrey. 2. Dr. Tom Main, Director, Cassel Hospital, Ham Common, Sutton, Surrey. 3. Conducted seminar at Maudsley *215 Hospital, London. 4. Dr. Morris Carstairs, Dr. Neal O'Connor, Maudsley Hospital, London. 5. Presented a lecture to the Royal Medical Psychological Association, London. 6. Conducted a seminar at the Tavistock Institute for Mental Health, London. 7. Dr. T. P. Rees, Director, Warlingham Park Hospital, Warlingham, Surrey. 8. Dr. Snowden, Marlborough Day Hospital, London. 9. Dr. Walter Maclay, Board of Control, Ministry of Health, London. 10. Dr. David H. Clark, Director, Fulbourn Hospital, Couldson, Surrey. 11. Dr. Freudenberg, Director, Netherene Hospital, Couldson, Surrey. 12. Dr. Eric Trist, Dr. John Bowlby, Dr. A. Ken Rice, Tavistock Institute and Clinic, London. Both Schwartzes were usually present during interviews or tours. Charlotte G. Schwartz assisted her husband by taking notes and occasionally conducted separate interviews. Some portion of the time spent in Europe was devoted to vacationing. The Schwartzes purchased an automobile in Europe which they used in traveling from place to place, and which they had shipped to the United States on their return. They also purchased furniture while in Europe on which a down payment was made. They spent about $8,600 *216 during their four months abroad. Prior to his departure for Europe, Morris S. Schwartz arranged with a director of one of the divisions of the Ford Foundation to prepare a memorandum of his observations of some mental health research establishments in Holland and Denmark for an honorarium of $100. He wrote a nine-page memorandum while in Europe and received $100. In 1955 the Schwartzes lived in a rented six-room, two-story house in Rockville, Maryland. The second floor of the house contained three rooms, two of which were used by each petitioner as a study. The petitioners had a professional library which they had accumulated over the course of their professional lives. On their joint tax return for 1955, as originally filed, petitioners claimed an itemized deduction of $3,500 as expenses incurred solely by Morris S. Schwartz on a business trip to Europe. On this return petitioners claimed a rental expense deduction of $900 for "office rental" for the use of their home for business purposes. They calculated the amount of this deduction as follows: Per Month
Rent
$ 110
Utilities (gas, electricity and
heat)
50
Cleaning Lady
80
Garbage collection
10
Telephone
10
Total per month
$ 260
Multiplied by
8 months
Total for 8 months
$2,080
Rent for 4 months while
in Europe at $110 per $440
Water, lawn, window
washing
180
620
Total expenses
$2,700
1/3 applicable to business use $900
*217 On their return petitioner also claimed a depreciation deduction of $500 on their professional library. They arrived at this amount by estimating that it contained 1,000 volumes; that the average cost of the books was $5 and that the average useful life of the books was 10 years. In November 1957 petitioners filed an amended joint return for the year 1955 in which they claimed a deduction of $6,061.50 for the trip to Europe. This amount was itemized on the amended return as follows: Travel Expenses - Business Trip to Europe
M. S. Schwartz
Air fare
$ 540.00
Auto Expenses - (gas; oil; insurance; driving license;
shipping; repairs; depreciation, etc.)
1,151.50
Transportation in cities
80.00
Meals, lodging, hotel expenses, etc. - 78 days at $25 per day
1,950.00
Miscellaneous
420.00
$4,141.50
C. G. Schwartz
Air fare
$ 540.00
Transportation; Washington to New York and return
30.00
Meals, lodging, hotel expenses, etc. - 78 days at $18
per day [$1,404]
1,350.00
$1,920.00
$6,061.50
In the statutory notice respondent disallowed all the deductions detailed above. In explanation of the disallowance of the European expenses *218 and the rental deduction, the statutory notice stated: the amounts, if expended, constitute personal expenditures and as such are not deductible. In respect to the depreciation deduction, the deficiency notice explained you are not entitled to the deduction * * * claimed * * * as depreciation on books since it is not an ordinary and necessary expense of a business and for failure of substantiation of the depreciation base. At trial Morris S. Schwartz conceded that the deduction for the European trip should not exceed $4,137.70. Opinion The first question is as to the deduction for the expenses of petitioners for travel and living expenses on their European trip. They now concede this deduction should not exceed $4,137.70. Petitioner's position is that approximately two-thirds of their total European trip expenses are deductible as business expenses under section 162(a)(2), [1] Internal Revenue Code of 1954. Their argument is that Morris S. Schwartz's "trade or business" was the profession of a research sociologist in the area of mental illness and health; that his traveling to Europe was for the purpose of seeing and observing what was being done *219 in other countries in the field of mental illness and health; that the trip was both ordinary and necessary in the furtherance of his research sociologist profession; and that it was also necessary to have his wife accompany him on the trip to assist him in his observations and interviews. At the outset petitioners have the burden of establishing a trade or business to which the expenses of the trip could be related. The terms "trade" and "business" as used in the statute mean any occupation which includes *220 the use of time, attention, labor, or capital for the purpose of producing a profit. Throughout his testimony and in his brief filed here, Morris S. Schwartz always refers to himself as a research sociologist. [2] However, it cannot be said his research activities, except when performed under a grant, produced income and we do not understand petitioners to argue it did. *221 Petitioner's entire argument is built upon the foundation that Schwartz was engaged in the practice of a profession where expenditures for research were necessary in order to maintain and preserve his present position as a practitioner of his chosen profession. But Schwartz's engagement in the practice of a profession merely means engagement in employment where he received income as an employee. He admits his trade or business was not that of a writer for profit. He occasionally received a fee for a lecture. Such activities as he stated were compensated by the prestige that resulted. In prior years he derived income as a salaried employee for foundations but his main income was from teaching and he derived a lesser portion of his income from what he calls "consulting." It appears that his consulting work consisted largely of acting as part-time instructor in two or three hospitals in the Washington area on a regular basis of so many days or half days a week. [3] He calls his remuneration for "consultation" work, "fees", and respondent argues such remuneration was salary. We think the name given to the compensation is immaterial. At the time he went to Europe in 1955 he testified *222 he was a consultant at St. Elizabeth's Hospital one-half day a week and when he returned he became a consultant at the same hospital five half days a week. In the following year, 1956, he became a full-time salaried employee of a federally-financed project. Before he left for Europe he stated in a letter he was looking around for a "new position" and he wondered if The Menninger Foundation had "any positions open" that might be attractive to him. We feel the record fairly shows that Schwartz's trade or business was that of an employee; that he worked part time for several employers and that his main source of income was from teaching, which was his principal activity. While his profession may have been that of a research sociologist, his trade or business for income tax purposes was that of an employee. While the trip to Europe might be necessary to the continuance of research activities, it is not shown the trip was necessary to the continuance of Schwartz's *223 employment. Schwartz's research activities were not profitable. They merely prepared him for the profitable activity of employment. His research, like the articles he wrote, increased his prestige in his profession or else it was equivalent to securing further education in order to gain future employment. The case here is much like Manoel Cardozo, 17 T.C. 3. There a college professor's expenses for a trip to Europe where he engaged in research were held not deductible because research was not the activity in which he was primarily engaged, which was teaching. The case of James M. Osborn, 3 T.C. 603, is also much in point. There a college professor sought deduction for expenses involved in preparing scholarly books. The books were not potentially profitable but the alleged profit incentive was that his stature would be increased and this would help him secure employment. The deduction was disallowed on the ground that the writing was not engaging in a profitable enterprise but it merely prepared him for the profitable enterprise of employment. This case is distinguishable from Brooks v. Commissioner, 274 F. 2d 96, reversing Matilda M. Brooks, 30 T.C. 1087. *224 There the expenses of a trip to Europe by a research scientist were allowed but the Court was able to find as a fact that the conduct of research was required by the scientist's contract of employment. The opinion stated: But research, and attendant expenses, was required of petitioner in order that she might retain her position with and the stipend from the University. Her contract with the University so provided. The moment her researches stopped, her compensation stopped. * * * No such finding of fact could be made here. Schwartz testified the trip was voluntary on his part. We hold the expenses of the trip to Europe were not related to Schwartz's profit-making activity which was that of an employee, and such expenses are not deductible. Petitioners deducted $500 for depreciation of their professional library. Respondent disallowed the deduction as "not an ordinary and necessary expense of a business and for failure of substantiation of the depreciation base." Respondent admits technical books, purchased by a teacher and used by him in his profession as a teacher, are subject to depreciation *225 under section 167, Internal Revenue Code of 1954. See I.T. 3448, C.B. 1941-1, 206; G.C.M. 11654, C.B. XII-1-250. Petitioners' approach to the issue presented was to place in evidence a list of the titles of almost 800 books, in their library with the name of the author and publication dates of each volume. We have scanned this list and some of the formidable titles would indicate the scholarly interest of a teacher or student. It appears some of the books had been acquired by Charlotte Schwartz prior to her marriage in 1951. The following from Schwartz's testimony illustrates how he computed the library depreciation deduction: I calculated I had about a thousand books; I figured that on an average they cost about $5 each, which came to $5,000. I estimated that their life would be ten years, which came to $500 for the year of 1955. Petitioners seem to sense the inadequacy of this testimony and argue respondent's disallowance should not be sustained "on such a narrow ground as failure to substantiate the date of purchase and the cost of each individual volume." *226 The purpose of section 167 is to allow a taxpayer to recover his cost of property used in producing income at the end of its useful life. Several essential elements just must be known before there can be, in the language of the statute "a reasonable allowance" for depreciation. Amongst those elements are dates of acquisition and costs. Estimates can be used for the span of useful life but estimates of average value in the taxable year of property purchased largely in prior years will not serve as a substitute for costs. With no evidence of costs of the books or dates of acquisition, petitioners' claim for depreciation fails for lack of proof. Louis Boehm, 35 B.T.A. 1106. Petitioners claimed a deduction of $900 as office rental representing the cost of their business use of two second floor rooms in the 6-room house they rented as a residence. It was their testimony that they each used a separate room as a study. We see no justification for any allowance for a business office for Charlotte. She was a full-time employee of the U.S. Public Health Service. While there was some testimony that she occasionally used her study in performing work for her husband, it cannot be *227 said her study was devoted to her husband's business use. We think some allowance should be made for Schwartz's use of a room in the house as study. It fairly appears from the entire record that he had no other office or study and that he would have need of a study in connection with his activities as a teacher and lecturer. One-sixth of the rent and cost of utilities in 1955 amounts to $341.66. We allow that sum on the claimed business use of the property. Decision will be entered under Rule 50. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and * * *↩
2. Morris S. Schwartz testified: I call myself a research sociologist in the area of mental illness and health. My particular and most concentrated activity has been in research in mental hospitals per se. I have done work on other mental health facilities, research, that is, such as out-patient clinics and after care, but my particular concentration has been within the mental hospital itself. What I am interested in and what has produced what Dr. Ewalt called these revolutionary movements in the mental hospital has been our research on the social structure, that is, the organization of the hospital as a kind of social entity, if you like, and the research on the interpersonal relations in the hospital and how these activities affect patients in terms of their getting worse, better, or staying the same in the mental hospital. Q. This has been the specialty within the area of your profession. A. That's right.↩
3. Schwartz described his consultation work at Chestnut Lodge Sanitarium by saying: I would teach the graduate nurses or the seminar or a consultation once a week, and the undergraduate nurses also once a week basis.↩