Arthur T. **HADLEY** and Susan K. **Bryant**, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Appellee.

Lloyd McKim **GARRISON** and Sarah **Garrison**, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Appellee.

Nos. 678, 681, Dockets 86–4148, 86–4153.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1987.

Decided May 19, 1987.

Irwin Karp, Port Chester, N.Y., for appellants Hadley and Bryant.

James B. Lewis, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for appellants Garrison.

Roger M. Olsen, Asst. Atty. Gen., Washington, D.C. (Michael L. Paup, Jonathan S. Cohen, Teresa E. McLaughlin, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for appellee.

Before OAKES, MESKILL and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

These two cases, decided by the same Tax Court judge, involve the question whether an author during the taxable years after 1975 and before 1987 may deduct as business expenses the expenses incurred in writing a book, or whether the author must capitalize those expenses and depreciate them ratably over the estimated life of the income stream from the book. The Commissioner argues, and the Tax Court found, that section 280(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 280(a) (1982), requires capitalization rather than immediate deduction of an author's expenses. Section 280(a) states that "except in the case of production costs which are charged to capital account, amounts attributable to the production of a film, sound recording, book, or similar property which are otherwise deductible ... shall be allowed as deductions only in accordance with the provisions of subsection (b) [requiring capitalization]." The Commissioner argues, again as the Tax Court found, that this language is unambiguous and that an author who writes a manuscript unambiguously "produc[es] ... a ... book." Because we think that this language is not unambiguous and may indeed relate to what a book publisher does rather than to what an author does, we look at the legislative history of section 280, originally written as section 210(a) of the Tax Reform Act of 1976 (the "Act"), Pub.L. No. 94–455, 90 Stat. 1520, 1544. When we do so, it is quite evident that the provision was aimed principally at tax shelter activity, namely production company tax shelter partnerships organized to produce films, sound recordings, or books, and by no means was intended to apply to an author's creation of the manuscript underlying the book to be published.

As to the separate question whether authors' expenses in writing manuscripts are deductible in the year incurred (for a cash basis taxpayer) under I.R.C. § 162, or must be capitalized under I.R.C. § 263, the cases that have dealt with the subject, as well as the underlying symmetry of the tax law and other factors with bearing, indicate rather plainly that these expenses are immediately deductible and not to be capitalized. Accordingly, we reverse, knowing that the Tax Reform Act of 1986 compels capitalization by authors for tax years 1987 and thereafter. The 1986 Act did so, however, with the Conference Report's statement that "[n]o inference is intended as to the nature of these properties under present law," H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess. II–308 n. 1 (1986), U.S.Code Cong. & Admin.News 1986, pp. 4075, 4396, so that we are not here concerned with the impact of the Tax Reform Act of 1986.

In a number of cases over the years, the Commissioner has argued the question whether an author or other artistic entrepreneur was engaged in a business or merely a hobby, on the one hand, or whether his or her expenses were ordinary and necessary as required for deductibility, on the other, all without apparent concern as to whether they were deductible as expenses or had to be capitalized.[1] Here,

---

1. *See, e.g., Doggett v. Burnet,* 65 F.2d 191 (D.C. Ct.App.1933) (Commissioner unsuccessfully argued that taxpayer who had incurred expenses arranging for the publication of religious books was not in a business); *May v. Commissioner,* 39 B.T.A. 946 (1939) (Commissioner unsuccessfully argued that expenses of motion picture director and writer were not "ordinary and necessary"); *Kluckhohn v. Commissioner,* 18 T.C. 892 (1952) (Commissioner unsuccessfully argued that expenses incurred in researching for a book and article were not ordinary and necessary); *Whitman v. Commissioner,* 19 T.C.M. (CCH) 456 (1960) (Commissioner challenged deductions on ground that taxpayer was not in trade or business of writing or illustrating);

however, the Commissioner conceded that each taxpayer/author was in the trade or business of being an author, although the Government's briefs rather wistfully suggest that the concessions may have been improvident. And the Commissioner does not contest that the claimed expenses are ordinary and necessary. For our purposes, therefore, the only issue in both cases is whether the expenses are deductible for the tax years in which they were incurred or must be capitalized over the useful life of the book produced.

In the case of author Hadley the book of concern is *The Empty Polling Booth,* which was published in 1978, and in the case of author Garrison the book is *Still a Distant Drum,* which at the time of the writing of the briefs had still not been published. Garrison's case involves $3,055 worth of expenses incurred in calendar year 1980 attributable to his writing *Still a Distant Drum,* and Hadley's case involves $20,743 worth of expenses incurred in 1978 attributable to his book. Both authors had received previous advances for their books but in their respective taxable years received no advances or royalties. In both cases the Commissioner disallowed the deductions for expenses and the authors contested the resulting income tax deficiencies in the United States Tax Court before Samuel B. Sterrett, Chief Judge. The Tax Court first found against Garrison and then followed the *Garrison* decision in finding against Hadley, the decisions being reported as *Garrison v. Commissioner,* 86 T.C. 764 (1986), and *Hadley v. Commissioner,* 51 T.C.M. (CCH) 948 (1986).

Stated succinctly, the Tax Court's view was that section 280 unambiguously requires amounts attributable to the production of a book to be "capitalized and deducted over the life of the income stream generated from the production activity." 86 T.C. at 766. The Tax Court said, "Since petitioner is an individual who incurred expenditures attributable to the writing of a

book, those production costs clearly fall within the ambit of section 280." *Id.,* at 766–67. Although the court held that it was unnecessary for it to look at the legislative history in depth because the statute was so unambiguous, it did note that Congress enacted section 280 in an attempt to curb tax shelters, particularly in the motion picture industry, citing S.Rep. No. 938, 94th Cong., 2d Sess. 71–79 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News at 2897, 3507–3515. So saying, however, the Tax Court added that "while congressional action was directed primarily at motion picture shelters, there is no evidence that the legislative purpose was aimed exclusively at tax shelter activity." 86 T.C. at 767. The court then concluded that "[h]aving failed to find an unequivocal legislative purpose," it would refuse to interpret the statute in the manner suggested by petitioner Garrison "because to do so would be contrary to the clear language of section 280." *Id.*

We do not find the statute so clear or the legislative history so equivocal. The statute uses the words "production" and "book." There are many definitions of "book," but a principal one relates to the tangible property consisting of a collection of written, printed, or blank pages fastened together along one edge, bound between covers into a volume.[2] This kind of "book" one generally thinks of as being "produced" or "manufactured" by a book publisher. To be sure, we think of an author as "writing a book" and in a rather stilted fashion perhaps sometimes even as "producing" a book. Quite the more usual sense, however, is of an author "writing" or "authoring" a "manuscript" or "creating" a work, a piece of fiction, a volume of prose or poetry, or the like, which later becomes a book. In the general sense, authors are not engaged in the "production" of books—book publishers are. Au-

---

*Rood v. United States,* 184 F.Supp. 791 (D.Minn. 1960) (Commissioner unsuccessfully contended that sculptor was not in a trade or business); *Gestrich v. Commissioner,* 74 T.C. 525 (1980) (Commissioner unsuccessfully argued that tax-

payer deducting office and travel expenses was not in the trade or business of being an author).

**2.** *See* Webster's Third New International Dictionary (1971).

thors, rather, create the stuff of which books are made; they write manuscripts.

The Copyright Act of 1976, written at the same time as the Tax Reform Act of 1976 —indeed, the two statutes were enacted fifteen days apart—is phrased in these same terms. It states that

> "Copies" are material objects ... in which a work is fixed ... and from which the work can be perceived, reproduced, or otherwise communicated....
>
> ....
>
> "Literary works" are works ... expressed in words ..., regardless of the nature of the material objects, such as books, ... in which they are embodied.

17 U.S.C. § 101 (1982). Thus, Copyright Act protection subsists "in original works of authorship fixed in any tangible medium of expression ... from which they can be perceived.... Works of authorship include ... literary works...." *Id.* at § 102(a). Or again, "the owner of copyright ... has the exclusive right[ ] ... to do and to authorize ... [distribution of] copies ... of the copyrighted work to the public by sale or other transfer of ownership...." *Id.* at § 106. The Copyright Act, then, following what we believe is common parlance, draws a distinction between an author's literary work and the material objects in which the work is fixed or embodied, that is to say, the books produced by a publishing company.

It certainly cannot be said, as the Commissioner argues, that an author is unambiguously engaged in the production of a book when he writes a manuscript. Our conclusion is buttressed by the very language of Code section 280. It requires "amounts attributable to the production of a film, sound recording, book, or similar property" to be capitalized and written off under the income forecast method. "Film" is defined as "any motion picture film or video tape," I.R.C. § 280(c)(1), and "sound recording" as "works that result from the fixation of a series of musical, spoken, or other sounds," *id.* § 280(c)(2). The production of a film or sound recording thus may encompass, but certainly is not equivalent to, the writing of the film script or the composition of the music. So too, the production of a "book," which term is not defined, may encompass, but is not equivalent to, the writing of the manuscript. At least one cannot say that the equivalence is unambiguous. Therefore, following Learned Hand's injunction that "[t]here is no surer way to misread any document than to read it literally," *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (L. Hand, J., concurring), *aff'd,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945), we will look to the purpose of the Tax Reform Act of 1976 in general and of section 280 in particular to give meaning and function to the words used. We will perforce, in an effort to ascertain that purpose, look to the legislative history leading up to the enactment of the Act. Even before that, however, we will look to the case law and beyond to see what light is shed on that purpose and on the deductibility of authors' expenses.

We have already mentioned the cases in which the Commissioner questioned whether a taxpayer author was engaged in the trade or business of being an author and whether the expenses claimed were ordinary and necessary to that business, *see* note 1 *supra.* In only a few cases has the Commissioner sought to capitalize writing expenses, and none of these cases involved the effect of Code section 280. In *Brooks v. Commissioner,* 274 F.2d 96 (9th Cir. 1959), the Commissioner challenged a deduction by a university professor for travel expenses paid in connection with freelance research and writing. The Commissioner argued that the expenses resembled a capital investment in the nature of expenses for further education. The court nevertheless held that the expenses were ordinary and necessary expenses incurred in the taxpayer's "business of research," and allowed the deduction. *Id.,* at 99. In the case of *Stern v. United States,* 71–1 U.S. Tax Cas. (CCH) ¶ 9375 (C.D.Cal.1971), *nonacq. in result,* Rev.Rul. 73–395, 1973–2 C.B. 87, the Commissioner again argued that traveling expenses incurred in researching and writing material for a book should be capitalized, and again the court held that the expenses were immediately

deductible. It was not until *Faura v. Commissioner*, 73 T.C. 849, 862 (1980), however, that the Tax Court unequivocally held that an author was entitled to deduct expenditures incurred in his trade or business of writing rather than being required to capitalize them under Code section 263. The court relied not only on *Brooks* and *Stern, supra,* but also on Treas.Reg. § 1.162–6 (1958), which permits professionals to deduct their professional expenses, and on section 2119 of the Tax Reform Act of 1976, 90 Stat. at 1912, which expressly protects book publishers from Rev.Rul. 73–395 but which is irrelevant for our purposes here.[3] The *Faura* tax court reserved until another day any opinion relating to section 280.

In *Snyder v. United States*, 674 F.2d 1359, 1365 (10th Cir.1982), the Tenth Circuit, in remanding the case to the district court for more adequate findings, agreed with *Faura* that an author engaged in the business of writing "may currently deduct those items shown to be ordinary and necessary rather than capitalize them." In *Encyclopaedia Brittanica, Inc. v. Commissioner*, 685 F.2d 212 (7th Cir.1982), however, the Seventh Circuit required the capitalization of payments by a book publisher to a compiler for preparation and editing of a natural science dictionary. The court distinguished *Faura* and *Snyder* by pointing out that the purchase of a ready-to-publish manuscript was a "nonnormal, nonrecurring" expense and concluded that "we need not decide whether *Faura* is good law, and we are naturally reluctant to precipitate a conflict with the Tenth Circuit." *Id.*, at 216. The court nonetheless indicated a hesitancy "to endorse the *Fau-*

*ra* line of cases," *id.*, at 215. This is the case law, and it is thin to be sure, but for the most part it is supportive of authors' ability to deduct prepublication expenses.

Perhaps the best law review commentary on the subject is the Note entitled *Tax Treatment of Prepublication Expenses of Authors and Publishers*, 52 Mich.L.Rev. 537 (1983), in which the author concludes that "[p]roper analysis of an author's prepublication expenses reveals that the author is receiving income from the sale of services rather than from the production of an asset, and thus should be allowed to deduct his expenses immediately." *Id.* at 571; *cf.* I.R.C. § 1221(3) (literary compositions are not capital assets under the Code). This view finds support in the 1954 Code's treatment of authors' royalty income. The 1954 Code generally required that income from artistic works be allocated to the years during which the works were produced, treating such income in the same manner as compensation for long-term employment. *See* 1 J. Mertens, *Law of Federal Income Taxation* § 6.16 (rev. 1981) (citing I.R.C. § 1302 (1954) (repealed 1964)). These provisions were replaced by the much broader income averaging provisions of the 1964 and 1969 Tax Reform Acts. *See id.* § 6.19a.

Given this background, we agree with the Tenth Circuit and *Faura* that authors' prepublication expenses need not be capitalized under Code section 263. Therefore, unless Code section 280 mandates otherwise (and excluding consideration of the 1986 Tax Reform Act), a taxpayer engaged in the trade or business of being an author may deduct his or her ordinary and neces-

**3.** In Rev.Rul. 73–395, 1973–2 C.B. 87, the IRS announced that it would not follow the decision in *Stern, supra,* and that prepublication expenses should be capitalized under Code section 263. In response to this ruling, Congress passed section 2119 of the Tax Reform Act of 1976, 90 Stat. at 1912, to relieve publishers from the effect of Rev. Rul. 73–395, allowing them to continue treating prepublication expenses as they had in the past. The House Report explained that "historically tax accounting practices in the publishing industry have varied greatly and no standard procedures have been developed," and "in view of the uncertainty with respect to the treatment of prepublication expenditures," the IRS should deal with the issue not through Rev.Rul. 73–795 but through regulations with only prospective application. H.R. Rep. No. 658, 94th Cong., 1st Sess. 337–38 (1975), *reprinted in* 1976 U.S.Code Cong. & Admin.News at 3234. As yet no such regulations have been issued. We find no significance in Congress's failure expressly to place authors within the ambit of section 2119. Our interpretation of the existing law regarding authors' prepublication expenses shows there was no need to provide them the protection of section 2119.

sary business expenses under Code section 162.

With this setting in mind, we turn then to section 280 and the Tax Reform Act of 1976. We have previously mentioned the ambiguity in Code section 280 in that neither the word "book" nor the word "production" is defined. Another point to be made, however, is that section 280 was made applicable only to individuals, Subchapter S corporations, which are taxed directly to their shareholders, *see* I.R.C. §§ 1361–1379, and personal holding companies, which are taxed at the top individual rate. *See* I.R.C. §§ 541–547.[4] Section 280 does not apply to other corporations. We note also that section 2119 of the Act, 90 Stat. at 1912, protects publishing corporations from Rev.Rul. 73–395, which ruled that prepublication expenditures should be capitalized. *See* note 3 *supra.* Thus, if the Commissioner's and the Tax Court's construction of section 280 is correct, the little fish—individual authors—are caught in the capitalization net while the big fish—publishing corporations—are not. This seems incongruous, to say the least.

The legislative history indicates that the true nature of the Act was to attack a broad category of tax shelters. Section 101 of the House bill that became the Act, H.R. 10612, 94th Cong., 1st Sess. (1975), would have hit at real estate, farm, oil and gas, motion picture, equipment, and professional sports tax shelters by imposing a "limitation on artificial losses" ("LAL"), reducing or preventing the deduction of losses from such activities from other income, *see* H.R.Rep. No. 658, 94th Cong., 1st Sess. 25–85 (1975), *reprinted in* 1976 U.S.Code Cong. & Admin.News at 2919–2980. But the Senate Committee on Finance rejected section 101 because it found LAL complex and harmful to the economy, S.Rep. No. 938, 94th Cong., 2d Sess. 39, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 3475. Rather, the Committee on Finance substituted for LAL a group of specific provisions aimed at tax shelters. These provisions were contained in Title II of the bill as reported by that Committee, entitled "Amendments Related to Tax Shelters," and consisted of ten sections, one of which—section 207—proposed enactment of Code section 280. In its Report, the Committee on Finance discussed section 207 of the bill under the title "Motion Picture Films," S.Rep. No. 938 at 71–79, *reprinted in* 1976 U.S.Code Cong. & Admin. News at 3507–3515. The Report described one type of motion picture tax shelter as "the limited partnership . . . formed to produce a film," *id.,* at 71; noted that the partnership "writes off the costs of production as they are paid," *id.;* and stated that "the production company shelter may be expanding into other areas, such as the publishing field," *id.,* at 76. The Report concluded that the capitalization requirement in section 207, subsequently I.R.C. § 280, was to apply to persons "engaged in the service of producing, displaying, or distributing a film, sound recording . . . book, or similar property (such as a play, etc.)," *id.,* at 77–78.

On the Senate floor, certain Senators criticized Title II as insufficiently responsive and attempted unsuccessfully to restore the LAL provisions of the House bill, 122 Cong.Rec. 18,803 *et seq.* (1976). However, the Conference Committee basically followed the Senate bill, *see* S.Conf.Rep. No. 1236, 94th Cong., 2d Sess. 399 *et seq.* (1976), 1976–3 C.B. (Vol. 3) 807. The Conference Report on the Senate amendment that added Code section 280 to the bill read in part as follows:

> [T]he Senate amendment contains a capitalization rule, which requires individuals and subchapter S corporations to capitalize the costs of producing and distributing motion pictures, books, records and other similar property. . . .
>
> . . . The conference agreement generally follows the capitalization rules of the Senate amendment. However, the rules are to apply only to production costs (including the costs of making prints of

---

**4.** Section 280 was amended by the Revenue Act of 1978, Pub.L. No. 95–600, to apply also to foreign personal holding companies, the income of which is taxed directly to their shareholders. *See* I.R.C. §§ 551–552.

the film for distribution) and not to distribution costs.

*Id.*, at 418–19, 1976–3 C.B. (Vol. 3) at 822–23.

There is nothing in the legislative history to indicate that authors were among the intended targets of Code section 280. Authors and their expenses are not mentioned in the Senate Finance Committee Report or in the subsequent legislative history of Code section 280. Rather, the intended targets of Code section 280 were individual taxpayers investing in tax shelter partnerships that produce or purchase films, records, books, and similar works. *See also* 6 J. Mertens, *Law of Federal Income Taxation* § 25.36 (rev. 1985) (discussing § 280 purely in terms of tax shelter activity). The Finance Committee Report refers repeatedly to tax shelters, their investors, and their deduction practices, stating, for example, that "the production costs will be written off by the taxpayer over the useful life of the asset which he has acquired as a result of his investment." S.Rep. No. 938 at 78, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 3514. An author does not acquire an "asset" as a result of his "investment." He creates a manuscript as a result of his personal efforts, that is, his investment in time and thought. This view is supported by I.R.C. § 1221, which provides that because a literary composition is the result of an author's personal efforts, it is not a "capital asset." *See* 4 J. Mertens, *Law of Federal Income Taxation* § 22.19 (rev. 1980).

It is also important to note that as passed by the House of Representatives, the bill did not contain Code section 280. That section was added by the Senate Committee on Finance. Yet, the very same Committee on Finance supported the deduction of authors' writing expenses. The Committee, in advocating that the protection of section 2119 specifically include authors, stated that "authors should be allowed to deduct as business expenses the essential, reasonable costs of earning income from their writing." S.Rep. No. 938 at 404, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 3833. The Committee expressed the opinion that "the [IRS's] position to disallow any deductions for authors' prepublication expenses and its decision not to follow the ruling in *Stern v. United States* results in inequitable treatment for taxpayers who are professional authors engaged in the business of writing." *Id.* It therefore does not make sense to conclude that the Finance Committee, in adding section 280, intended to require that authors begin capitalizing their expenditures.

To be sure, were it not for Code section 280, a tax shelter organizer could establish a partnership to engage in book production and immediately deduct expenses involved in acquiring and editing a manuscript and publishing the book. But an author's expenses of writing are personal to him and cannot be marketed in a tax shelter partnership. The danger that a tax shelter organizer might purchase an author's creation at an inflated price and then market that creation does not arise in the context of the writing activity itself. Thus, it seems evident that the Committee was concerned with book publishing tax shelter activity, not writing.

The Commissioner argues that although Congress may have intended the provision to apply primarily to tax shelters, the legislative history of section 280 indicates that the provision was also directed at the more widespread problem of unwarranted tax avoidance, or at least deferral, resulting from the mismatching of income and expenditures relating to a literary property. From a passage in the Senate Report that speaks of the mismatching of income and expenses created by a taxpayer's accelerating deductions "in connection with the production costs of a motion picture film," S.Rep. No. 938 at 77, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 3513, the Commissioner extrapolates that section 280 must be deemed equally applicable to all types of book production activity, including that which is not conducted by a "production company" shelter. In light of our conclusion that section 280 concerns book publishing tax shelters, not writing, this argument is a non sequitur. As the Commissioner has to, and does, recognize, au-

thors are not even mentioned in the legislative history relating to section 280.

The Commissioner also makes the ad hominem argument with respect to Garrison's book that "[t]he prospect of allowing current deductions, year after year, with respect to a book which, like Penelope's shawl, is never finished, is alone sufficient to justify the application of Section 280." Yet the Commissioner has other means of dealing with these types of abuses, such as challenging whether the taxpayer is in the trade or business of being an author or whether the expenses were ordinary and necessary. In the present case the Commissioner conceded those issues.

The Commissioner further contends that existing Treasury Regulations, 26 C.F.R. § 1.471–1 (1986), already provide that publishers' printing and binding costs are to be apportioned on an aliquot basis to the books on hand at the end of the taxable year, and thus reading section 280 to apply only to publishers would be redundant. Section 280, however, applies to all book production costs, for instance the costs of acquiring a manuscript and editorial costs, and not just to the costs of printing and binding covered by the regulation.

In reaching the determination that section 280 was not meant to apply to authors, we do not use the practical argument that authors would experience great difficulty in estimating the useful life of their creations in order to capitalize expenses over that life. In an activity as ephemeral as writing a book, the difficulties in estimating a future income stream and determining the time of ultimate write-off when it becomes clear that either a book will not be published or, if published, will not sell, appear immense. *Cf.* McDowell, *Why Book Publishers Are Targets for Merger,* N.Y. Times, Mar. 17, 1987, at C17, col. 1 (stating that 50% of new books are returned to the publisher unsold). Nevertheless, in the much-hailed Tax Reform Act of 1986, section 280 is repealed as to the future, and there is a new requirement for capitalization in a new Code section 263A(b). Pub.L. No. 99–514, § 803, 100 Stat. 2350. This section requires capitalization of expenses in relation to tangible property, including books "and other similar property embodying words, ideas, concepts, images, or sounds, by the creator thereof," thus applying uniform capitalization rules to the costs of "producing a motion picture or researching and writing a book." H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess. II–308 n. 1 (1986), U.S.Code Cong. & Admin.News 1986, p. 4396. Congress says it can be done. Ours is not to reason why. We say only that Congress did not intend to do so until it wrote the Tax Reform Act of 1986.

Judgments reversed.