**DOUBLEDAY & COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 86 CV 307.**

United States District Court, E.D. New York.

Sept. 12, 1989.

Satterlee Stephens Burke & Burke, Jeremy Nowak, New York City, for plaintiff.

U.S. Dept. of Justice, Peter Sklarew, Washington, D.C., for defendant.

COSTANTINO, District Judge.

Plaintiff, Doubleday & Co., Inc., commenced this action seeking a refund of corporate income tax in the sum of $1,423,328 plus interest arising from its 1977 tax year return.

The parties have submitted a detailed stipulation of facts as to all issues and both sides have filed cross-motions for summary judgment. For the reasons to follow defendant's motion for summary judgment is granted in all respects.

## BACKGROUND

As stated above the parties have entered into a 45 page stipulation of facts which clearly sets forth the history of this litigation. For the sake of clarity, the Court will summarize a few of the important facts.

Plaintiff has been in the publishing business since 1897, and has since expanded into various related businesses. In mid 1976, plaintiff acquired the assets of Dell Publishing Co., Inc. and its subsidiaries. Largely replicating the corporate structure of Dell, plaintiff formed a group of new corporations among which were; a new Dell Publishing Co. Inc., Dell Distributing, Inc., and Dell International, Inc. (referred to herein collectively as "Dell"). The issues involved in this suit concern plaintiff's tax liabilities for its fiscal year ended April 30, 1977, stemming from its Dell subsidiaries with which plaintiff filed a consolidated income tax return.

In this consolidated return, plaintiff reported income on an accrual basis rather than a cash basis. The accrual method for tax purposes essentially requires taxpayers to report items of income and expense in the year in which the right or obligation becomes fixed and definite in amount. However, Dell sells most of its paperbacks on an installment payment basis and reported incomes from such sales is reported under the installment method. Essentially, the installment method allows a taxpayer to report gross receipts from installment sales over more than one year in accordance with the payment schedule, even though an accrual method taxpayer would otherwise be required to report the entire contract price in the year of the sale.

Plaintiff's original refund claim was $1,423,328 and premised on a particular issue concerning the computation of deferred gross profit on installment sales ("deferred gross profit issue"). The deferred gross profit issue first arose in an audit of plaintiff's fiscal 1977 tax return wherein the IRS determined that deferred gross profit on installment sales was incorrectly computed. (Plaintiff initially indicated that it would not contest the adjustment made in connection with this issue, although no binding agreement was entered, and plaintiff later determined to contest the adjustment and file its refund claim. As further noted below, the IRS eventually accepted plaintiff's position with respect to the deferred gross profit issue when processing plaintiff's amended refund claim, but again no binding agreement was reached.)

Plaintiff's amended refund claim restated the deferred gross profit issue and further claimed additional amounts of overpaid tax based on additional issues. All of

the other issues raised in the amended refund claim were settled between plaintiff and the IRS.

Subsequently the IRS tentatively determined to allow plaintiff's refund claim with respect to the deferred gross profit issue which would have resulted in a reduction in plaintiff's taxable income in the amount of $2,965,266 and would have warranted the conclusion that plaintiff overpaid income taxes for its 1977 fiscal year in the amount of $1,423,328. This figure is identical to the amount of the overpayment claimed by plaintiff in its original unamended claim.

Notwithstanding the facts set forth above, the IRS denied plaintiff's claim for refund because, in considering the same, it raised a new issue by disallowing the deduction of certain royalty expenses claimed by plaintiff, referred to herein as "royalties reconciliation deduction." This disallowance increased plaintiff's taxable income by $3,139,617. The "royalties reconciliation deduction" issue first arose in connection with an IRS audit of plaintiff's fiscal 1978 and 1979 tax returns (and also after plaintiff's amended claim for refund with respect to fiscal 1977 had already been filed). At such time, the IRS was barred by the statute of limitations (I.R.C. § 6501) from making a further assessment with respect to fiscal 1977 but was able to rely upon the disallowance of the royalties reconciliation deduction to deny plaintiff's refund claim.

The IRS further determined that its disallowance of the royalties reconciliation deduction required a concomitant elimination of the reported accrual of certain commission income on plaintiff's fiscal 1977 tax return, referred to herein as "commissions reconciliation income". This decreased plaintiff's taxable income by $286,000, partially offsetting the increase from the disallowance of the royalties reconciliation deduction.

Together, the disallowance of the royalties reconciliation deduction described above (+$3,139,617) and the concomitant elimination of the commissions reconciliation income also described above (−$286,000) result in a net increase in taxable income of $2,853.617. This increase does not fully offset the $2,965,266 decrease in taxable income which the IRS was tentatively accepting with respect to the deferred gross profit issue as described above. Rather, plaintiff's taxable income would still have been $111,649 lower, which would have entitled plaintiff to a refund of $53,590 in tax, plus interest.

For the reasons set forth in the preceding paragraph, the IRS posted a credit to plaintiff's fiscal 1977 tax account in the amount of $53,590. The credit was frozen or suspended pending the full and final resolution of all issues pertaining to plaintiff's original and amended refund claim. However, on August 18, 1986, the IRS mistakenly removed the freeze code on its computer and a refund was issued to plaintiff in the amount of $53,590 in tax, plus interest, with respect to fiscal 1977.

In connection with the foregoing facts, the United States had a right, pursuant to I.R.C. § 7405(b) and 28 U.S.C. § 1346(c), to bring a counterclaim in this suit, alleging that the refund of $53,590 in tax plus interest was erroneous and, therefore, plaintiff and defendant executed an agreed order for entry by the Court, granting defendant leave to file its supplemental counterclaim for such purpose. Plaintiff further agrees that the United States will be entitled to recover said refund of $53,590 plus interest, with interest thereon as provided by law, in the event the Court rules in the United States' favor with respect to the "deferred gross profit" issue even if the Court rules in plaintiff's favor with respect to the "royalties reconciliation deduction" issue (or on the "sales reconciliation income" issue raised as an offset to the IRS's "royalties reconciliation deduction" defense). Plaintiff's argument as stated in the preceding sentence is limited to a determination of the issues on cross-motions for summary judgment and does not address the issue of which party has the burden of proof in the event that a trial of any factual matters is determined to be necessary.

Based upon the stipulation of facts submitted, it is now incumbent for the Court to decide the following issues:

## "DEFERRED GROSS PROFIT" ISSUE

Whether a paperback book publisher's royalty payments to authors or hardcover publishers and certain other publishing costs may be immediately deducted in full or must instead be treated as part of the "cost of goods sold" on an installment plan, within the meaning of Regs. § 1.453–1(b), and therefore written off over the years by decreasing the percentage of the full sale price that is considered "gross profit" reportable over the years in proportion to installment payments?

## "CAPITALIZATION" ISSUE

Whether royalty expenses, including advance-paid minimum guaranteed royalties, plus expenses for plate processing, typesetting, editing, and paperback book cover design, may be fully deducted in the year in which the particular title to which they are attributable is first published, or instead must be capitalized and then depreciated over the useful life of the publishing rights granted under the applicable contract.

## "ROYALTIES RECONCILIATION DEDUCTION" ISSUE

Whether the terms of taxpayer's standardized publishing contract—providing for royalty payments in accordance with periodic statements to authors or hardcover publishers showing the number of paperbacks sold to distributors less "a reasonable estimated reserve against returns" require, as a matter of law, that taxpayer's deduction for royalties accrued during the year be limited to royalties attributable to gross sales less estimated total eventual returns therefrom (i.e. estimated retail sales from shipments to distributors during the year)?

## "SALES RECONCILIATION INCOME" ISSUE

Whether a determination in favor of the United States on the "royalties reconciliation deduction" issue (i.e. that royalties should be based on the year's sales net of estimated total eventual returns from those sales) would also require an offsetting determination that taxpayer should have reported its net sales for tax purposes on the basis of gross sales less estimated total eventual returns from such year's sales (instead of gross sales less only the year's returns as reported by the taxpayer on its fiscal 1977 income tax return)?

## "COMMISSIONS RECONCILIATION INCOME"

Whether the wording of the taxpayer's distribution agreements with magazine publishers—tying periodic credits earned by the taxpayer as commissions on magazine sales it arranges to sales less a "reasonable estimated reserve for returns" require, as a matter of law, that the amount taxpayer reports for tax purposes as commissions income from distributing magazines be based on gross sales of magazines arranged by the taxpayer less estimated total eventual returns of magazines from such year's sales.

## DISCUSSION

### I. CAPITALIZATION ISSUE

The defendant contends that plaintiff's royalty payments and prepublication expenses (plate processing, typesetting, editing and cover design) must be allocated to a capital account and amortized or depreciated over the average useful life of the title to which they pertain. Plaintiff argues that it utilized proper accounting procedures when it fully deducted these expenses in the year they incurred.

### A. Royalty Payments

■ Section 162 of the Internal Revenue Code, 26 U.S.C. § 162(a), allows a deduction for a taxpayer's "ordinary and necessary" business expenses paid or incurred during the taxable year. However, this is qualified by § 263(a) of 26 U.S.C.[1] which denies a current deduction for those costs incurred in the creation or acquisition of

---

**1.** Title 26 U.S.C. § 161 gives § 263 priority over § 162. See also *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17, 94 S.Ct. 2757, 2766, 41 L.Ed.2d 535 (1974).

property having a useful life substantially beyond the taxable year. These type costs must be capitalized rather than immediately deducted. Therefore, the issue facing the Court is whether plaintiff's prepublication expenses (plate processing etc. and Royalty payments) are immediately deductible or fall under the ambit of § 263 and therefore must be capitalized.

As stated in the stipulation of facts, the plaintiff deducts the full amount of any minimum royalties guarantee incurred by Dell in the year of its publication even where such prepaid guarantee is not fully absorbed by sales during such year. Title 26 U.S.C. § 263(a) provides that no deduction shall be allowed for amounts paid for property or to increase its value, although deductions for its depreciation may be allowed. The regulations under § 263 indicate that the cost of acquiring property having a useful life substantially beyond the tax year is a capital expenditure. *See also* 26 C.F.R. § 1.263(a)–(2). 26 C.F.R. Reg. 1.461(a)(2) provides that an accrual method taxpayer may not deduct fully "any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year." *See also Commissioner v. Idaho Power Co.*, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974).

Dell's royalty expenses are for rights of more than one year in duration. The author contracts expressly indicate that the royalties are in exchange for the "exclusive book publishing and selling rights and the right to sub-license such rights to the manuscript ... for the full term of the copyright" in the United States. (See exhibit B–2, attached to Stipulation of Facts). The copyright is to be registered by Dell in the name of the author. (See exhibit B–2). Plaintiff contends that this type contract amounts to a license for which Dell must pay rents that should be deductible as an ordinary and necessary business expense. *See Cory v. Commissioner*, 230 F.2d 941, 944 (2d Cir.1956), *cert. denied*, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50 (1956). The court finds plaintiff's argument unpersuasive. In *Seattle Brewing & Malting Corp. v. Commissioner*, 6 T.C. 856 (1946) the

court in discussing various cases regarding the deductability of license fees noted:

> The right to use a trade name is a monopoly, as is a copyright or a patent. It carries with it the right to control its use in connection with a manufactured article and to prevent any competition that might destroy its value. It is a property right ...

*Seattle Brewing* at 868. The Tax Court concluded:

> We know of no reason why one who is the owner of the right to use a trade name may not grant to another its exclusive use in a limited territory for all future time upon the payment of a price. [Citation omitted]. Such a grant, while not disposing of the entire property in the grantor, is the equivalent of such disposition within the limited territory granted. Clearly such a grant would be a capital transaction and the amount paid by the grantee could not be exhausted because it was perpetual.

*Seattle Brewing* at 873. It has also been held that where the grant is not perpetual, the capital expenditure may be depreciated but is nonetheless capital. In *Associated Patentees, Inc. v. Commissioner*, 4 T.C. 979 (1945), a self-described five-year "license" for the use of certain patent rights in exchange for percentage royalties, later superseded on the last day of the tax year in question by a contract for the life of the patents and inventions was held to be a capital transaction, and the royalties were deductible only as depreciation. *See also Liquid Paper Corp. v. United States*, 2 Cl.Ct. 284 (1983) (exclusive rights to secret formula for percentage royalty on sales); *Newton Insert Co. v. Commissioner*, 61 T.C. 570 (1974), *aff'd per curiam*, 545 F.2d 1259 (9th Cir.1976) (exclusive rights to make, use, and sell patented products for percentage of sales for life of patents).

The Court in *Associated Patentees*, 4 T.C. 979 after holding the patent royalties to be in the nature of capital expenditures, held that the total cost of the patents included not only the first years payments but also "the future payments which will be made and cannot be determined until the

expiration of the patents, at which time their value passes out" *Associated* at 985. In noting the obvious computation problem, the court held that the reasonable allowance for depreciation provided for by the statute, was equivalent to this payment made in each year, thus agreeing with the taxpayer that this would enable the recovery of total costs prorated equitably over the lives of the patents. *Associated* at 985. Dell's minimum royalties guarantees are advance payments of royalties based on anticipated sales that my extend beyond the close of the taxable year. Thus earned royalties are charged against the prepaid guarantee as books are sold and no further amounts are paid until the guarantee is absorbed. (See ¶ 27, 56 in Stipulated Facts). Therefore, the total cost would not be prorated equitably over the useful life of the publishing rights if the as yet unabsorbed portion of the prepaid guarantee was allowed to be deducted in the first year, with a lesser amount allowed in the second year. Therefore, the court finds that plaintiff's royalty payments must be capitalized and spread over the period up until which they are overtaken by earned royalties, with allowable depreciation being equivalent initially to the amounts of earned royalties being absorbed and thereafter equivalent to royalties being paid.

## B. Design Expenses

■ The government contends that plaintiff's prepublication expenses are governed by § 263 of the code because the expenditures add value to the manuscript or copyright to be obtained with respect thereto or, result in the creation of a separate capital asset and clearly benefit every copy of the work thereafter sold and not just those sold during the initial publication year.

In 1973 the Internal Revenue Service ('I.R.S.'), responding to an increasing number of court cases seeking an immediate deduction of prepublication expenses, See, *Stern v. United States*, 71–1 U.S. Tax Cas. (CCH) ¶ 9375 (C.D. Cal.1971) enacted Revenue Ruling 73–395. This ruling held that

the I.R.S. did not consider the Stern holding controlling and it would not be followed as precedent. The I.R.S. ruling set forth the following:

Expenditures that are directly attributable to producing and copyrighting a manuscript of a literary composition by a taxpayer result in the creation of an asset having a useful life that extends substantially beyond the close of the taxable year and are thus capital in nature and not deductible for federal income purposes.

The passage of Revenue Ruling 73–395 produced numerous objections from the publishing industry. The publishing industry was successful in that Congress enacted § 2119 of the Tax Reform Act of 1976 [2]. Section 2119 provides:

(a) *General Rule.*—With respect to taxable years beginning on or before the date on which regulations dealing with prepublications expenditures are issued after the date of enactment of this Act, the application of Section 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to any prepublication expenditure shall be administered—

(1) without regard to Revenue Ruling 73–395, and

(2) In the manner in which such sections were applied consistently by the taxpayer to such expenditures before the date of the issuance of such revenue ruling.

(b) *Regulations To Be Prospective Only*—Any regulations issued after the date of enactment of this Act which deal with the application of section 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to prepublication expenditures shall apply only with respect to taxable years beginning after the date on which such regulations are issued,

(c) *Prepublication Expenditures Defined*—For purposes of this section, the term "prepublication expenditures" means expenditures paid or incurred by the taxpayer (in connection with his trade

2. Tax Reform Act of 1976, Pub.L. No. 94–455 § 2119, 90 Stat. 1520, 1912 (1976).

or business of publishing) for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product.

This section relieved publishers from the effect of Revenue Ruling 73–395 and allowed them to continue treating prepublication expenses as they had in the past until the I.R.S. issues specific regulations. Doubleday asserts that § 2119 allows them to continue their practice of deducting prepublication expenses. The government takes the position that § 2119 protects only accounting methods consistently applied by a taxpayer since before Revenue Ruling 73–395 was issued in 1973. Since Dell was first incorporated in 1976, it is ineligible to seek relief under § 2119. The court finds defendant's argument meritorious. In response to a request by a newly formed taxpayer/publisher seeking advice with respect to whether it could, pursuant to § 2119, deduct advances paid out, the I.R.S. issued Letter Ruling 8201015, 1982 I.R.S. Letter Rulings (CCH) ¶ 6,978 at p. 72,528 (1981). The Ruling stated that since the taxpayer was not in existence when Revenue Ruling 73–395 was issued, it could not claim relief under § 2119. Since § 2119 suspended the revenue ruling, the proper treatment of the advance author royalties rested solely on applicable code sections. The ruling went on to hold that the manuscripts produced by authors receiving the advance royalties from the taxpayer had a productive life extending beyond the tax year thus requiring capitalization. Though the court is well aware that letter rulings such as the one above has no precedent value, the court feels that the reasoning employed is nevertheless sound. In addition, it seems apparent that the Congressional intent of § 2119 was to protect only those taxpayers that had consistently deducted these expenses. The House Ways and Means Committee report accompanying the legislation, H. Rep. No. 94–658, 94th Cong., 2nd Sess. 338 (1976), U.S. Code Cong. & Admin. News 1976, pp. 2897, 3234 notes that "to prevent the unfairness of retroactively changing the rules in midstream, § 2119 was designed to declare a moratorium on the I.R.S.'s ability to alter any bystanding practices of taxpayers until after regulations were promulgated." The report states in part:

Your committee's bill allows taxpayers to treat their prepublication expenditures in the manner in which they have been applied consistently by the taxpayer in the past and until regulations are issued after the date of enactment of this bill.

. . .

... Until these regulations are issued, the Internal Revenue Service shall administer the application of section 162, 174 and 263 to publisher's prepublication expenditures without regard to Rev. Rule 73–395. In addition, the Service is to administer these sections in the same manner as they were consistently applied by the taxpayer prior to the issuance of Rev. Rule 73–395.

It is apparent that Congress acted to prevent any injustice to those businesses which had consistently deducted such expenses until such time specific regulations could be promulgated. If Congress had intended to protect newly formed businesses or those who did not have a longstanding consistent policy of deducting such expenses, it simply would have said so. Therefore, it is the opinion of this court that plaintiff is not protected by § 2119.

■ The plaintiff next argues that the Second Circuit ruling in *Hadley v. Commissioner*, 819 F.2d 359 (2d Cir.1987) makes prepublication expenses deductible. In *Hadley*, the court held that authors may claim deductions for their business expenses under I.R.C. § 263. The court ruled:

As to the separate question whether author's expenses in writing manuscripts are deductible in the year incurred (for a cash basis taxpayer) under I.R.C. § 162, or must be capitalized under I.R.C. § 263, the cases that have dealt with the subject as well as the underlying symmetry of the tax law and other factors with bearing, indicate rather plainly that these

expenses are immediately deductible and not to be capitalized.

*Hadley* at 360.

The defendant argues that *Hadley* provides no explicit guidance on whether publishers, as distinct from authors, must capitalize manuscript acquisition and improvement costs, and urge that the opinion may actually be read to support their position. Since the passage of § 2119, the I.R.S. has continued to require capitalization of prepublication expenses. However, an examination of recent court decisions shows a split in the proper treatment of prepublication expenses. In *Faura v. Commissioner*, 73 T.C. 849 (1980), the Tax Court held that an author was entitled to deduct expenditures incurred in his trade or business of writing rather than being required to capitalize them under code § 263. In *Snyder v. U.S.*, 674 F.2d 1359 (10th Cir.1982), the court agreed with *Faura* that an author engaged in the business of writing may currently deduct those items shown to be ordinary and necessary rather than capitalize them. However, in *Encyclopaedia Britannica, Inc. v. Commissioner*, 685 F.2d 212 (7th Cir.1982) the court required the capitalization of payments by a book publisher to a complier for preparation and editing of a natural science dictionary. The court distinguished *Faura* and *Snyder* by noting that the purchase of a ready-to-publish manuscript was a non-normal, non-recurring expense. *Encyclopaedia* at 216. The Second Circuit in *Hadley*, noting the thin amount of caselaw in this area added "Perhaps the best law review commentary on the subject is the note entitled *Tax Treatment of Prepublication Expenses of Authors and Publishers*, 82 Mich.L.Rev., 537 (1983)."

The Mich.L.Rev. Note, after reviewing the applicable law and policy considerations, endeavors to present a principled analysis under which it concludes that authors and publishers should not be treated alike. The note considers authors to be receiving income from what is akin to the sale of services, partly explaining the taxation of their income at ordinary rates as a result of Code Section 1221(3). It contends they should therefore be allowed to deduct

expenses as incurred. Note at 560–64. The note concludes that publishers, however, must capitalize all of the cost items at issue in this case. Note at 565–70. Of royalties and royalty advances, the Note observes:

> They represent the purchase price paid by the publisher to obtain publication rights to the manuscript and as such must be capitalized. So long as advances are not deducted until earned, deduction of royalties in the year earned represents a perfect matching of cost with income produced, since the percentage of total cost deducted in any one year is exactly proportional to the income produced in that year.

Note at 567–68 (footnotes omitted).

This is also in accord with *Commissioner v. Idaho Power*, 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974) ("Construction-related expense items, such as tools, materials and wages paid construction workers, are to be treated as part of the cost of acquisition of a capital asset.") Similarly, with regard to editorial preparation costs, the note observes that "these are expenses to improve and put into service an asset having a useful life beyond the taxable year" and should be capitalized. Note at 569–70. The type-setting, design, and plate costs are characterized in the note as "non-recurring production costs" that should be capitalized "as costs of putting an asset into production unless the publisher can demonstrate that the asset has a useful life of less than one year." Note at 570.

Therefore, since the Second Circuit's opinion in *Hadley* dealt only with authors, and the court is of the opinion that a distinction between authors and publishers is warranted, plaintiff's reliance on *Hadley* is unpersuasive.

The court hereby holds that plaintiff's prepublication expenses must be capitalized pursuant to § 263 of the code and as such defendant's motion for summary judgment on this issue is granted.

## II. DEFERRED GROSS PROFIT ISSUE

■ Plaintiff sells many of its books to wholesalers, retailers and jobbers on an

installment basis, where actual receipt of the sale price is spread over more than one year. Under 26 U.S.C. § 453, which governs the installment method, dealers in personal property could elect to recognize gain from qualifying sales in installments as payments were received.

Under the installment method, the amount of income on installment sales to be reported for a given year was "that proportion of the payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price." 26 U.S.C. § 453(a) (1976). Thus, in order to compute the amount of income from an installment sale that must be reported in the current tax year and, correspondingly, the amount that may be deferred until later years when further payments are received, it is necessary to determine the fraction or percentage of the total sales price that represents the taxpayer's "gross profit." This percentage is then multiplied by the amounts received in each tax year in which installment payments are made in order to determine the amount of such payments representing the gross profit to be reported on the taxpayer's return for each such tax year. The regulations applicable during the year in question defined gross profit, in the case of dealers in personal property, as "sales less cost of goods sold." 26 C.F.R. § 1.453–1(b).

In other words, under the installment method, both the total sale price and the corresponding total "cost of goods sold" are reported in corresponding fractions over the years in which installment payments continue to be receive. By contrast, certain business expenses not considered part of the "cost of goods sold" within the meaning of 26 C.F.R. Section 1.453–1(b), but which may nevertheless be related to goods sold on an installment plan (for example, costs of storage, distribution, and advertising), can be deducted entirely in the year of sale if accrued in that year (by an accrual basis taxpayer). The net tax effect of treating an expense related to goods sold on an installment basis as a part of the "cost of goods sold" is that a taxpayer recognizes the benefit of this expense (in reducing taxable income) only ratably over the same tax periods in which the total sales price is allowed to be spread. On the other hand, if an expense related to goods sold on an installment basis is not treated as part of the "cost of goods sold" within the meaning of 26 C.F.R. § 1.453–1(b), then the full benefit is recognized immediately as a deduction in the current tax year. Thus, the exclusion of an expense from "cost of goods sold" results in a greater deferral of the tax liability resulting from the sale than if such expense were included.

The dispute between the parties is mainly over the treatment of royalties paid to hardcover publishers and to authors who by contract grant rights to produce and sell their literary properties as paperbacks by Dell. Plaintiff, on its fiscal 1977 tax return deducted Dell's reprint and author royalties for that year in full, and did not treat such royalties as part of cost of goods sold for purposes of computing the gross profit on installment sales. Plaintiff contends that the royalties either are a "selling expense" under 26 C.F.R. § 1.471–11(c)(2)(ii), because they are incurred as a function of sales under the author contracts, or are another type of non-inventoriable expense specified under this provision of the regulations. Defendant contends that the royalties must be included in cost of goods sold for purposes of computing the gross profit on installment receivables. Defendant argues that all costs that constitute or increase the capital value of the particular goods sold should be included in the cost of goods sold for the installment method tax accounting. For the reasons to follow, the court agrees with the position set forth by defendant.

Title 26 U.S.C. § 471 gives the I.R.S. the authority to require taxpayers to maintain inventories and to require they be maintained in a manner consistent with generally accepted accounting principles that clearly reflects income. The regulations under § 471 describe the method under which manufacturers must maintain inventories i.e. "the full absorption method of inventory costing" 26 C.F.R. § 1.471–11. These regulations contain a complex set of rules

which prescribe the types of costs that must be included in inventory (cost of goods sold), including direct production and labor costs 26 C.F.R. § 1.471–11(b)(2), and certain types of indirect production costs. 26 C.F.R. 1.471–11(c)(2)(i). A third category of costs are not included in inventory for tax purposes regardless of their treatment on the taxpayer's financial statement. 26 C.F.R. 1.471–11(c)(2)(ii). Included in this last category is "selling expenses", which is what plaintiff contends that the royalty payments and other expenses fall under. The court, however, disagrees. 26 C.F.R. 1.471–11(b)(2) defines "direct production costs" as those costs which are incident to and necessary for production or manufacturing operations or processes and are components of the cost of either direct material or labor.

Direct material costs are those materials which become an integral part of the specific product. The ideas expressed in the book are an integral part of the product and the royalties paid to publish these ideas are certainly a prerequisite to the commencement of production. Plaintiff's argument, that these royalty payments are selling expenses is without merit. Royalties paid for the exclusive book publishing and selling rights or the exclusive right to publish and sell the paperback editions are not the type of expenses contemplated by § 1.471–11(c)(2) "selling expenses." The term "selling expenses" is grouped with marketing and advertising expenses and distribution expenses. This would seem to indicate that this regulation is concerned with the nature of the cost item and not with how it is computed or when it matures. Royalty payments have little if anything to do with encouraging, inducing or processing sales orders. Instead, the royalty payments paid by Dell are for the right to exploit the ideas acquired through the publishing contract. Those ideas expressed in the book are an integral part of the product. Therefore, the court finds that the royalty payments are direct production costs.

■ As to the prepublication expenses, the court also does not find them to be

selling expenses as plaintiff contends but rather finds them to fall within the ambit of indirect production costs, specifically 26 C.F.R. 1.471–11(c)(3)(i)(f) and (j). Lastly, plaintiff's argument that § 2119 of the Tax Reform Act of 1976 shields them from including such items in the cost of goods sold is also without merit. In addition to the reasoning set forth previously, it is clear that plaintiff fails to meet the requirements of § 2119 because on previous returns it never even used the installment method. Therefore, defendant's motion for summary judgment on the Deferred Gross Profit issue is granted.

### III. ROYALTIES, SALES AND COMMISSIONS RECONCILIATION ISSUE

Since the court has found in favor of the defendant on the first two issues, that publishing rights acquisition costs must be capitalized and that royalties are only deductible as depreciation and not as a period expense, the remaining issues have become moot. Although the remaining issues might matter for future years, no decision is required as to the fiscal year (1977) involved in this suit. However, if the parties agree that a determination is required as to these remaining topics, the court will address them upon request.

### CONCLUSION

For the reasons articulated above, defendant's motion for summary judgment is granted.

The defendant is hereby directed to file a judgment within ten days of receipt of this order.

SO ORDERED.